### UNITED STATES of America,

v.

**Jose MUYET, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa, and Antonio Feliciano, Defendants.**

No. S2 95 Cr. 941 (PKL).

United States District Court,
S.D. New York.

Nov. 5, 1996.

As Amended Nov. 18, 1996.

Mary Jo White, United States Attorney for the S.D. New York, New York City (Jay Holtmeier, Thomas M. Finnegan, of counsel), for United States.

Roy R. Kulcsar, New York City, for Jose Muyet.

Golub & Golub, LLP, New York City (Mitchell A. Golub, of counsel), for John Muyet.

Robert L. Weinstein, New York City, for Pedro Narvaez.

Hoffman & Pollok, New York City (Susan C. Wolfe, of counsel), for Julio Matias.

Barocas & Schmidt, New York City (Sam A. Schmidt, of counsel), for William Delvalle.

Sanford M. Katz, New York City, for Frank Sosa.

Freeman, Nooter & Ginsberg, New York City (Lee A. Ginsberg, of counsel), for Antonio Feliciano.

### OPINION AND ORDER

LEISURE, District Judge:

On June 13, 1996, a Grand Jury filed a superseding indictment (the "indictment"), S2 95 Cr. 941, against the defendants in this case. The indictment alleges that the defendants participated in the illegal activities of a violent narcotics trafficking organization known as the "Nasty Boys" which operated primarily in the Bronx, New York. According to the indictment, this organization has engaged in the sale and distribution of large quantities of heroin and cocaine base, commonly known as crack. It is alleged that the affairs of this enterprise have been conducted through various acts of violence including assault, conspiracy to commit murder, attempted murder and murder.

The Government moves for the empaneling of an anonymous jury. In addition, seven defendants charged in the indictment, Jose Muyet, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa, and Antonio Feliciano (collectively, the "moving defendants"), bring various pretrial motions, including a motion for severance, requests for a bill of particulars, and requests for additional pretrial disclosures. For the reasons stated below, the Government's motion for an anonymous, semi-sequestered jury is granted, and the moving defendants' various pretrial motions are denied in their entirety.

## BACKGROUND

The Court will summarize the charges set forth in the forty-three count indictment as to the seven moving defendants.[1] Count One charges the moving defendants, except for William Delvalle, with participating in a criminal enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Count Two charges the moving defendants, except for William Delvalle, with conspiring to participate in a criminal enterprise in violation of RICO, 18 U.S.C. § 1962(d). Counts Three through Twenty–Nine charge various moving defendants, except for William Delvalle, with committing violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959(a). Count Thirty charges the moving defendants, except for Antonio Feliciano, with conspiring to violate the narcotics laws of the United States in violation of 21 U.S.C. § 846. Counts Thirty–One through Forty–Two charge various moving defendants, except for William Delvalle, with using and carrying firearms during and in relation to their violent crimes in violation of 18 U.S.C. § 924(c). Count Forty–Three charges the moving defendants, except for Antonio Feliciano, with using and carrying firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Before the Court are various pretrial motions brought by the Government and the moving defendants.[2] The Government moves for the empaneling of an anonymous, semi-sequestered jury in this case. Defendant William Delvalle moves for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Defendants Jose Muyet, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa and Antonio Feliciano each request a bill of particulars. Defendants Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa and Antonio Feliciano seek additional discovery, including a list of confidential informants, cooperating witnesses and all other Government witnesses.[3]

## DISCUSSION

### I. MOTION FOR AN ANONYMOUS JURY

The Government moves the Court to take the following precautions to ensure that the jury will be free from improper influence, intimidation or fear during the trial and during their deliberations: (1) limit *voir dire* so that the potential jurors on the *voir dire* panel, and the jurors and alternates selected to serve at trial, do not reveal their names, addresses, or places of employment; (2) during the trial, keep the jurors together during recesses, and allow the United States Marshals Service to provide lunch for the jurors as a group or take the jurors to lunch as a group each day; and (3) at the end of each trial day, allow the United States Marshals Service to transport the jurors together from the Courthouse to an undisclosed central location, from which they can leave for their respective communities. All of the defendants object to the use of these procedures.

---

1. The indictment charges ten defendants. One of those defendants, Eric Last Name Unknown, is currently a fugitive. He was severed from the case on October 18, 1996. Two others, Steven Camacho and Jaime Rodriguez, were dismissed from the case on October 2, 1996.

2. The Court heard oral argument on the defendants' motions on October 18, 1996. At that hearing, the Court decided several other pretrial motions. *See* Order dated October 22, 1996. The Court heard oral argument on the Government's motion for an anonymous jury on October 31, 1996.

3. The moving defendants also move to join in each other's motions to the extent such motions are not inconsistent with their individual positions.

■ The empaneling of an anonymous jury has "serious implications for a defendant's interest in effectively conducting voir dire and in maintaining the presumption of innocence." *United States v. Wong*, 40 F.3d 1347, 1376 (2d Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995); *see United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). Nonetheless, when a defendant's interests are outweighed by the jurors' interest in remaining free from real or threatened violence and the public's interest in having the jury render a fair and impartial verdict, the use of an anonymous jury is appropriate. *See Wong*, 40 F.3d at 1376; *Amuso*, 21 F.3d at 1264. The Court of Appeals for the Second Circuit has explained the rationale for the use of an anonymous jury as follows:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If "the anonymous juror feels less pressure" as a result of anonymity, . . . this is as it should be—a factor contributing to his impartiality.

*United States v. Barnes*, 604 F.2d 121, 140–41 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *see also United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir.) ("As a practical matter, we cannot expect jurors to 'take their chances' on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict."), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

■ The decision to empanel an anonymous jury is within the broad discretion of the District Court. *See Wong*, 40 F.3d at 1376; *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied*, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *United States v. Maldonado–Rivera*, 922 F.2d 934, 971 (2d Cir.1990), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991). The empaneling of an anony-mous jury is appropriate when: (a) there is strong reason to believe that the jury needs protection; and (b) the District Court takes reasonable precautions to minimize any prejudicial effects on the defendants and to ensure the protection of the defendants' fundamental rights. *See United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir.1995); *Wong*, 40 F.3d at 1376; *United States v. Thai*, 29 F.3d 785, 801 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *Amuso*, 21 F.3d at 1264; *Paccione*, 949 F.2d at 1192; *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *Thomas*, 757 F.2d at 1365.

## A. Strong Reason to Believe the Jury Needs Protection

■ In determining whether there is strong reason to believe that the empaneling of an anonymous jury is necessary, the District Court should consider the following factors: (1) the seriousness of the charges against the defendants; (2) the potential threat of corruption to the judicial process; and (3) the nature and degree of pretrial and expected trial publicity. *United States v. Gambino*, 809 F.Supp. 1061, 1065 (S.D.N.Y. 1992) (quoting *United States v. Melendez*, 743 F.Supp. 134, 137 (E.D.N.Y.1990)); *see Aulicino*, 44 F.3d at 1116 (anonymous jury appropriate when defendants attempted to tamper with witnesses); *Wong*, 40 F.3d at 1376–77 (anonymous jury appropriate when defendants' gang demonstrated willingness to obstruct justice and case had attracted publicity); *Thai*, 29 F.3d at 801 (anonymous jury appropriate when indictment charged crimes of violence, defendants attempted to subvert judicial process through intimidation and murder, and case was likely to attract media coverage); *Amuso*, 21 F.3d at 1264–65 (anonymous jury appropriate when indictment charged crimes of extreme violence and defendant had shown willingness to interfere with the judicial process); *Paccione*, 949 F.2d at 1192–93 (anonymous jury appropriate when defendants were charged with serious

crimes with "potential for long prison terms," witness had received anonymous threat, and "trial could be expected to be the subject of extensive publicity"); *Vario*, 943 F.2d at 240 (anonymous jury appropriate when codefendant had been charged with grand jury tampering and trial expected to attract publicity); *Tutino*, 883 F.2d at 1132–33 (anonymous jury appropriate when defendant had history of jury tampering and serious criminal record); *United States v. Persico*, 832 F.2d 705, 717 (2d Cir.1987) (anonymous jury appropriate when indictment charged violent crimes, defendants demonstrated willingness to obstruct justice, and trial expected to attract publicity), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Ferguson*, 758 F.2d 843, 854 (2d Cir.1985) (anonymous jury appropriate when evidence at trial would include discussions of killing government witnesses), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985); *Barnes*, 604 F.2d at 141 (anonymous jury appropriate when there were allegations of dangerous and unscrupulous conduct and there had been extensive pretrial publicity).

■ These well-established principles lead the Court to conclude that a semi-sequestered, anonymous jury is appropriate in this case.[4] The defendants are charged with serious offenses that carry long sentences and involve acts of extreme brutality; there is evidence that the defendants and their gang pose a threat to the judicial process; and this case has already attracted pretrial media attention which the Government reasonably predicts will continue during the trial.

### 1. Seriousness of the Charges

Even a cursory review of the indictment reveals the serious nature of the charges in the present case. Each defendant is charged with offenses that carry a statutory maximum sentence of life imprisonment plus additional mandatory consecutive terms of incarceration. If convicted on all counts, William Delvalle, faces a minimum sentence ranging from 32 to 39 years in prison without parole, and all of the other moving defendants must be sentenced to life without parole. The indictment names the defendants as members of an alleged violent narcotics trafficking organization, and charges six of the seven defendants with committing acts of violence, including attempted murder and murder, to protect, maintain and further their criminal enterprise. In total, the indictment charges those six defendants with eleven murders, and an additional three attempted murders and conspiracies to commit murder.

The evidence at trial will depict an extensive pattern of violence. For example, Jose Muyet, Pedro Narvaez and Julio Matias are charged with the murder of Angel Luis Rivera and his two companions. According to the Government, the evidence will show that Juan Machin, another member of the Nasty Boys, shot Rivera on the order of Jose Muyet. *See* Finnegan Affirmation ¶ 6 (hereinafter "Finnegan Aff.").[5] When Machin's gun jammed, he beat Rivera's head with the butt of his gun. *See id.* Julio Matias then shot Rivera several times as he lay prone on the ground. *See id.* When the attack began, Rivera's companions attempted to flee, but Narvaez allegedly hunted them both down and shot them to death. *See id.* The indictment charges Jose Muyet, Julio Matias and Frank Sosa with the murder of Antonio Flores. The defendants allegedly lured Flores, whom Muyet suspected of disloyalty, to a Nasty Boys meeting in Crotona Park in the Bronx. *See id.* ¶ 9.a. As Muyet began to talk to Flores, another member of the gang shot Flores in the head. *See id.* Thereafter, the Government contends, members of the Nasty Boys passed the gun around and fired additional shots into the victim's body. *See id.*

The Government represents that some of the incidents involve assaults, attempted murders and murders that were committed

---

4. In general, when an anonymous jury is required, sequestration is also required because "the only way to assure the anonymity of a jury, as a practical matter, is to sequester them." *United States v. Gotti*, 777 F.Supp. 224, 227 (E.D.N.Y.1991). Accordingly, the following analysis also supports the Court's decision to order partial sequestration of the jury.

5. Machin has pleaded guilty pursuant to a cooperation agreement with the Government.

in public places in New York. Jose Muyet, Pedro Narvaez, Julio Matias and Frank Sosa are charged with conspiracy to murder and attempted murder of members of the "Wolf-pack," a rival drug gang. The defendants, armed with an array of firearms, allegedly drove in a caravan to an area where they believed that they would find members of the Wolfpack, and opened fire on everyone standing in the area, including innocent by-standers. *See id.* ¶ 7. Numerous people were badly injured. *See id.* In another drive-by shooting directed at a different rival gang, more people were injured and two bystanders were killed in the spray of gun-fire. *See id.* Jose Muyet, John Muyet and Pedro Narvaez are charged with the murders of Carlos and Raymond Sanchez in that inci-dent. *See id.* The indictment charges José Muyet with the murder of Rafael Cruz as a favor to another drug dealer. *See id.* ¶ 8. According to the Government, Muyet and other members of the Nasty Boys cornered the victim in the doorway of a small restau-rant on Amsterdam Avenue in upper Man-hattan, New York. *See id.* On orders from Muyet, the gang repeatedly shot the victim with ruthless disregard to the numerous by-standers located within feet of the victim. *See id.*

The Court finds that these and the other acts of violence charged in the indictment strongly support the empaneling of an anony-mous jury because they "would cause a juror to reasonably fear for his [or her] own safe-ty." *Vario,* 943 F.2d at 241. The Court "cannot expect jurors to 'take their chances' on what might happen to them as a result of a guilty verdict ... [and] *even a general fear of retaliation* could well affect the jury's ability to render a fair and impartial verdict." *Thomas,* 757 F.2d at 1364 (emphasis added).[6]

## 2. Potential Threat to the Judicial Process

The defendants and other members of the Nasty Boys have shown a willingness to thwart the judicial process by intimidating witnesses and conspiring to suborn perjury and obstruct justice. The defendants may have even gone so far as to kill a potential witness. The Government represents that the evidence at trial will show that Julio Flores was murdered, at least in part, be-cause the Nasty Boys believed that he had told others about the gang's murder of Anto-nio Flores. *See* Finnegan Aff. ¶ 9.c.

Steven Camacho and Jaime Rodriguez, members of the Nasty Boys who were dis-missed from this case on October 2, 1996, were convicted after trial in another case for, among other things, conspiring to suborn perjury and conspiring to obstruct justice by preventing testimony through intimidation. *See id.* ¶ 11.h. The evidence demonstrated that Camacho and Rodriguez sent a letter to Jose Crespo, a cooperating witness, warning that if he testified, his family might be found dead some day. *See United States v. Her-nandez,* 85 F.3d 1023, 1027–28 (2d Cir.1996). In addition, the letter asked Crespo to sign documents falsely stating that the witness had been coerced by the Government into making false accusations against Camacho and Rodriguez. *Id.* at 1028. Robert Corona, who was named in the original indictment as a member of the Nasty Boys, has also in-formed the Government that Steven Cama-cho and Jaime Rodriguez repeatedly con-fronted him and warned him that he had better not cooperate with the Government. *See* Finnegan Aff. ¶ 11.i. Although these acts are not directly attributable to the re-maining defendants, they do indicate a will-ingness on the part of their associates to subvert the judicial process. Until recently, Camacho and Rodriguez were codefendants in this case. The Court may consider the improper conduct of the defendants' associ-ates in determining whether an anonymous jury is required. *See Aulicino,* 44 F.3d at

---

6. The defendants argue, and the Court agrees, that the mere fact that the indictment contains allegations of violence is not sufficient to warrant an anonymous jury. However, this is not a case involving an isolated allegation of violence. Rather, it is a case that involves numerous alle-gations of brutal murders that would cause any reasonable person to fear for his or her safety.

*See Vario,* 943 F.2d at 241. Moreover, as ex-plained below, the Court also finds that the de-fendants pose a threat to the judicial process and that the case is likely to attract media attention. It is these three factors, not a mere allegation of violence, that lead this Court to conclude that an anonymous jury is appropriate.

1116–17 (considering conduct of codefendants); *Vario,* 943 F.2d at 240 (considering conduct of codefendant who pleaded guilty). Camacho and Rodriguez, who were sentenced to lengthy prison terms, have nothing to lose by assisting the Nasty Boys with any future scheme to obstruct justice.

The Government also alleges that potential witnesses have reported threats and attacks by and at the direction of the remaining defendants. After Juan Machin pleaded guilty pursuant to a cooperation agreement with the Government, he stopped attending pretrial conferences with his codefendants before this Court. According to Machin, after the first such conference was held without him, John Muyet warned him that he was "stupid" if he was cooperating with the Government. *See* Finnegan Aff. ¶ 11.a. Sometime thereafter, Machin was attacked and slashed across the face with a sharp object by a fellow inmate at F.C.I. Otisville. *See id.* ¶ 11.b. The inmate who slashed Machin is allegedly associated with the "Latin Kings," another violent street gang which has allegedly issued orders to kill witnesses suspected of cooperating with the Government. *See id.* According to another inmate, the slashing was carried out pursuant to a "contract" between associates of the Latin Kings and the Nasty Boys, who were unable to attack Machin themselves because they were incarcerated in the Metropolitan Correctional Center in New York (the "MCC") at the time of the attack. *See id.* ¶ 11.e. Luis Quinones, another former member of the Nasty Boys who is now cooperating, told the Government that he was threatened by Jose Muyet. *See id.* at ¶ 11.f. Quinones alleges that he saw Muyet through a window at the MCC, and Muyet used hand signals and mouthed words indicating that he knew that Quinones was cooperating and that Machin had been slashed—Muyet allegedly pointed at Quinones and then ran his hand across his throat. *See id.*

The defendants argue that these allegations are not supported by reliable evidence but rather by the hearsay of unnamed informants. This argument only applies with force to the allegation that the slashing was carried out pursuant to a contract between the Latin Kings and the Nasty Boys.[7] However, the timing of the slashing, coupled with the statements by Machin and Quinones, corroborate the allegation that the defendants were involved in the slashing. Even if the Court were to disregard this allegation, the murder of Flores, the convictions of Camacho and Rodriguez for conspiring to suborn perjury and conspiring to obstruct justice, and the threats to Machin and Quinones also support the empaneling of an anonymous jury.

The defendants also seem to suggest that threats and attacks on cooperators are of slight relevance to the decision to empanel an anonymous jury because threats to cooperators are commonplace in a prison environment hostile to "rats." *See* Matias Mem. of Law in Opp'n to the Government's Mot. for an Anonymous Jury at 4. In the world in which the Nasty Boys operate, the slashing of a cooperating witness may be business as usual, but the Court is unwilling to accept the proposition that this does not translate into a threat to the judicial process or to potential jurors. The petit jury has not been selected. Therefore, the defendants have not yet had an opportunity to intimidate jurors. As the Court of Appeals has stated, "[i]t can be no answer that no untoward event ha[s] occurred up to the opening of the trial.... Cases need not be cited to prove the adage of the futility of locking the barn door after the horse has escaped." *Barnes,* 604 F.2d at 137. In cases like the present one, "in which allegations of dangerous and unscrupulous conduct abound[ ], precaution ... [is] best taken so that fears ... [do] not become realities." *Id.* at 141.

### 3. Pretrial and Expected Trial Publicity

This case has attracted pretrial media attention which the Government reasonably predicts will continue during trial. On November 1, 1995, the print media reported extensively about the original indictment and

---

7. Given the fact that cooperators in this case have been threatened and attacked, the Government has good reason to withhold the identity of the inmates who have provided information contained in the Finnegan Affirmation. The Court is satisfied that the Government has conducted a good faith investigation of the allegations contained in the Finnegan Affirmation.

the arrests of the Nasty Boys. *See, e.g.,* Mae M. Cheng, *Cavalry Comes: Cops, U.S. Agents Liberate 'Fort Apache',* Newsday, November 1, 1995, at A3; James C. McKinley, Jr., *31 Members of 3 Bronx Gangs Indicted on Murder Charges,* N.Y. Times, November 1, 1995, at B2; Greg B. Smith & Corky Siemaszko, *Drug Gangs Busted in Bx.,* N.Y. Daily News, November 1, 1995, at 22; *Members of 2 Violent Gangs Arrested in N.Y. Crackdown,* Wash. Post, November 1, 1995, at A20. The front cover of *Newsday* carried a picture of 1314 Seneca Avenue, which is alleged to be a building out of which the Nasty Boys ran their narcotics organization. Several local television shows have also carried stories on this case. *See* Finnegan Aff. ¶ 13. On April 26, 1996, *The Daily News* ran another story on the case and the various law enforcement agencies involved in the investigation. Based on the news coverage that the case has already generated and the fact that the media have continued to report stories about other major gang cases, *see, e.g., 'King Blood' on Trial,* Newsday, October 31, 1996, at A29, the Government reasonably predicts that media coverage will continue during the trial. The proposed precautionary measures will serve to shield the jury from such trial publicity, and will allow them to deliberate impartially. *See Wong,* 40 F.3d at 1377 ("The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment."); *Paccione,* 949 F.2d at 1193 (anonymous jury appropriate when expected trial publicity might expose "jurors to inappropriate contacts that could compromise the trial.").

\* · \* \*

In sum, the Court finds that the procedures requested by the Government are appropriate in the present case because the defendants are charged with serious offenses that carry long sentences, the defendants and their alleged associates pose a threat to the judicial process, and finally, the media are likely to devote considerable attention to this case.

### B. Reasonable Precautions to Minimize Prejudice and to Protect the Defendants' Fundamental Rights

■ To minimize any prejudicial effects on the defendants and to ensure the protection of the defendants' fundamental rights, the District Court should conduct a *voir dire* designed to uncover bias as to the issues or the defendants and should give the jurors a plausible and nonprejudicial explanation for taking security measures and for not disclosing their identities. *See Aulicino,* 44 F.3d at 1116; *Thai,* 29 F.3d at 801; *Paccione,* 949 F.2d at 1192; *see also Wong,* 40 F.3d at 1377 (noting that the extensive *voir dire* was sufficient to enable defendants to obtain fair and impartial jury); *Amuso,* 21 F.3d at 1265 (noting that by giving a neutral explanation for sequestration—to protect the jury from being tainted by pretrial publicity—the court preserved the presumption of innocence). Therefore, the Court will take the following precautions to protect the defendants' fundamental rights. First, the Court will use a comprehensive jury questionnaire to ensure that both the defense counsel and the Government will have sufficient information about each potential juror to allow them to exercise their challenges in an intelligent manner. *Gambino,* 809 F.Supp. at 1068. Second, the Court will instruct the jury at the outset of trial that these special procedures are routine in this type of case, and are designed to protect the jury from any contacts with the media. *Id.*

## II. MOTION FOR SEVERANCE

Defendant William Delvalle moves for severance of his trial from the trial of his codefendants. Delvalle argues that he will suffer "prejudicial spillover" from the evidence of his codefendants' acts of violence if they are tried jointly. The first twenty-nine counts of the indictment charge his codefendants with participating in a criminal enterprise in violation of RICO, 18 U.S.C. § 1962(c), conspiring to participate in a criminal enterprise in violation of RICO, 18 U.S.C. § 1962(d), and committing violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959(a). These counts contain allegations of violent crimes including assault, conspiracy to commit murder, attempted murder and murder. Delvalle is not charged as a member of the RICO enterprise or the RICO conspiracy,

nor is he charged with any of the violent offenses. However, he is charged in Count Thirty, which alleges that he and several codefendants conspired to violate federal narcotics laws in violation of 21 U.S.C. § 846; and Count Forty–Three, which alleges that he and several codefendants used and carried firearms during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).

■ Rule 14 of the Federal Rules of Criminal Procedure allows the District Court to order severance of a defendant charged with cooperative criminal activity if "it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants ... for trial together." Fed.R.Crim.P. 14. However, it is well-established that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993); *see United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir.1996). Joint trials promote efficiency and avoid the inequity of inconsistent verdicts. *See Zafiro*, 506 U.S. at 537, 113 S.Ct. at 936–37; *United States v. Haynes*, 16 F.3d 29, 32 (2d Cir.1994). Furthermore, joint trials prevent the last-tried defendant from gaining an unfair advantage by allowing him to see the prosecution's case before his trial. *See Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987). The presumption in favor of joint trials is particularly strong when the crimes charged involve "a common plan or scheme and defendants have been jointly indicted." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir.1991).

■ A defendant seeking severance under Rule 14 bears a heavy burden of showing that a joint trial would result in substantial prejudice. *See United States v. Burke*, 700 F.2d 70, 83 (2d Cir.) ("The burden is upon the moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." (quoting *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978))), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). The Supreme Court has instructed that "a district court

should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. at 938 (emphasis added). Even if a defendant shows that he may ·suffer some prejudice as a result of a joint trial or that he would have a greater chance for an acquittal at a separate trial, severance is not required. *See Zafiro*, 506 U.S. at 540, 113 S.Ct. at 938–39; *United States v. Beverly*, 5 F.3d 633, 637 (2d Cir.1993); *United States v. Harwood*, 998 F.2d 91, 95 (2d Cir.), *cert. denied*, 510 U.S. 971, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993). "Rather, '[t]he decision whether to sever multi-defendant trials is committed to the sound discretion of the trial court and is virtually unreviewable.'" *Harwood*, 998 F.2d at 95 (quoting *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir.1992)).

■ The crux of defendant's argument is that in a joint trial, he will be prejudiced by evidence of his codefendants' acts of violence. Claims of prejudicial spillover rarely succeed, particularly where the defendant advancing the claim is charged along with other defendants in a narcotics conspiracy. *See United States v. Gambino*, 809 F.Supp. 1061, 1074 (S.D.N.Y.1992) (citations omitted). "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden." *United States v. Vanwort*, 887 F.2d 375, 384 (2d Cir.1989) (quoting *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989)) (internal quotation marks omitted), *cert. denied*, 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990). Delvalle fails to satisfy this burden because even if the Court were to grant severance, much of the evidence regarding his codefendants' acts of violence would be admissible in his trial as proof of the existence and nature of the narcotics conspiracy. *See Haynes*, 16 F.3d at 32 (severance not required when relevant, competent evidence would have been admitted against defendant in separate trial); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211

(1994); *United States v. Casamento,* 887 F.2d 1141, 1153 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). The Second Circuit has explained that:

> A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.

*Rosa,* 11 F.3d at 341 (citations omitted).

In *Rosa,* defendants Oscar Rosa and Ricardo Rodriguez were charged along with their codefendants as members of the "Unknown Organization," a narcotics conspiracy similar to the one in this case. The proof at trial demonstrated that members of the Organization engaged in brutal acts of violence, including murder, to maintain discipline and loyalty within the Organization. Rosa and Rodriguez argued that they were entitled to severance because they were not personally charged with any acts of violence. The Second Circuit rejected their argument because they were integral parts of the narcotics conspiracy and, therefore, evidence of the workings of the Organization would have been admissible in their trials even if they had been tried separately. "Since the evidence was that the Organization's routine modus operandi involved the use of murder and mayhem to exclude competitors from its retail drug spots and to maintain discipline among its members, the acts of violence performed by other coconspirators were chargeable to Rosa and Rodriguez, and their claims of prejudicial spillover must be rejected." *Id.* at 342.

Delvalle is charged with participation in a narcotics conspiracy. The Government represents that the evidence at trial will show that the members of the Nasty Boys narcotics conspiracy engaged in brutal acts of violence to maintain discipline within the con-

spiracy and to force out competitors. The evidence which Delvalle objects to as prejudicial spillover would be admissible in a separate trial against him because it tends to prove the existence and nature of the narcotics conspiracy. Although Delvalle is not personally charged with any acts of violence, the Government alleges that he was a high ranking member of the narcotics conspiracy and was aware of and benefitted from the gang's violent activities. The indictment charges that Delvalle was a manager of heroin and crack sales on behalf of the narcotics conspiracy. Thus, his circumstances are quite similar to the moving defendants in *Rosa* and "the acts of violence performed by other coconspirators ... [are] chargeable to" Delvalle, and his claim "of prejudicial spillover must be rejected." *See id.*

The cases relied upon by defendant do not suggest a different result. In *United States v. Tellier,* 83 F.3d 578 (2d Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996), Roy Tellier was convicted for participating in a racketeering enterprise, conspiring to participate in a racketeering enterprise, and for violating the Hobbs Act. The Court of Appeals for the Second Circuit reversed the RICO convictions because there was insufficient evidence of two predicate acts as required by RICO. The Second Circuit then reversed the Hobbs Act conviction because it "involved a single robbery, to which all but a tiny sliver of the evidence admitted on the RICO charges is irrelevant." *Id.* at 582. In *United States v. DiNome,* 954 F.2d 839 (2d Cir.), *cert. denied,* 506 U.S. 830, 113 S.Ct. 95, 121 L.Ed.2d 56 (1992), Wayne and Judith May Hellman were charged along with members of the "DeMeo Crew," a component of the Gambino crime family, with mail fraud, wire fraud, and violations of RICO. The Government attempted to link the Hellmans with the RICO enterprise on a tenuous theory. The Government alleged that the DeMeo Crew bribed Judith Hellman for her efforts as a juror to secure an acquittal in a state court murder trial. The Government further alleged that the Hellmans used the proceeds of the bribe to buy a new home. The mail and wire fraud charges arose from their efforts to secure

loans for the new home and a new car. The trial court granted a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure dismissing the RICO charges against the Hellmans. However, they were convicted of mail fraud and wire fraud. The Second Circuit reversed their convictions because "[o]nce the RICO charges against the Hellmans were dismissed, all but an infinitesimal fraction of the evidence at this sixteen-month trial lost any relevance to the mail and wire fraud charges against them." *Id.* at 844. Both cases are easily distinguishable from the present case. The key factor in both *Tellier* and *DiNome* was that the evidence supporting the RICO charges would not have been admissible in separate trials of the defendants. As explained above, much of the evidence supporting the RICO charges would be admissible in a separate trial against Delvalle to support the narcotics conspiracy charge. Moreover, unlike the defendants in *DiNome*, who had few if any ties to the DeMeo Crew, Delvalle was allegedly a high ranking member of the Nasty Boys narcotics distribution conspiracy.

The Court finds that Delvalle has failed to meet his burden, under Rule 14, of demonstrating that a joint trial will result in substantial prejudice. Therefore, his motion for severance is denied. Nonetheless, the Court recognizes that in cases where one defendant is tried along with codefendants who are charged with acts of extreme violence, the former defendant may suffer some degree of prejudice. To mitigate the risk of prejudice, the Court will instruct the jury that it must consider the evidence as to each defendant individually. The Supreme Court has recognized that this precaution is sufficient to protect the defendant's trial rights because "juries are presumed to follow their instruc-

tions." *Richardson,* 481 U.S. at 211, 107 S.Ct. at 1709.

## III. MOTIONS FOR VARIOUS PRE-TRIAL DISCLOSURES

### A. Bill of Particulars

Defendants Jose Muyet, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa and Antonio Feliciano each request a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. The defendants seek details relating to: (1) Counts One and Two, the RICO enterprise charge [8] and the RICO conspiracy charge; [9] (2) Counts Three through Twenty-Nine, the violent acts in aid of racketeering charges; [10] (3) Count Thirty, the narcotics conspiracy charge; [11] and (4) Counts Thirty-One through Forty-Three, the firearms charges.[12]

An indictment need only set forth a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c). The purpose of a bill of particulars is merely to "inform a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy" when the indictment is too vague to serve this purpose. *United States v. GAF Corp.,* 928 F.2d 1253, 1260 (2d Cir.1991) (citing *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927)). It is not an investigative tool to be used for the "[a]cquisition of evidentiary detail." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.) (quoting *Hemphill v. United States,* 392 F.2d 45, 49 (8th Cir.), *cert. denied,* 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968)) (internal quotation marks omitted), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). In-

---

**8.** For example, Frank Sosa asks the Government to identify the members of the Wolfpack, a rival drug gang.

**9.** For example, Pedro Narvaez asks the Government to state the date that he joined the alleged racketeering conspiracy.

**10.** For example, Jose Muyet asks the Government to identify the members of the rival drug gang referred to in Count Seventeen.

**11.** For example, Julio Matias asks the Government to identify the various coconspirators and the locations where narcotics were allegedly sold.

**12.** For example, William Delvalle asks the Government to set forth the date, time and place that he is alleged to have used and carried a firearm.

deed, the Government is not required to particularize all of its evidence before trial. *United States v. Cephas,* 937 F.2d 816, 823 (2d Cir.1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). Accordingly, "[i]t is improper to use a bill of particulars to compel the Government to disclose the manner in which it will prove the charges or preview its evidence or legal theory." *United States v. LaMorte,* 744 F.Supp. 573, 577 (S.D.N.Y.1990); *accord United States v. Jimenez,* 824 F.Supp. 351, 363 (S.D.N.Y. 1993) ("[T]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or give a preview of its evidence and legal theories.").

■ The Court of Appeals for the Second Circuit has instructed that "[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres,* 901 F.2d at 234 (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd mem.,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)) (internal quotation marks omitted). If the information sought by the defendant is provided by the indictment or by some other pretrial disclosure, such as discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, a bill of particulars is not required. *See United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). The decision to grant or deny a bill of particulars is within the sound discretion of the District Court. *Torres,* 901 F.2d at 234.

■ In light of these established principles, the Court has carefully scrutinized the indictment together with the relevant pretrial disclosures and determined that they adequately advise the defendants of the specific acts of which they are accused. First, with respect to the RICO enterprise and the RICO conspiracy charges, the indictment provides the defendants with: (1) the names and aliases of the defendant members of the RICO enterprise and conspiracy; (2) the name of the enterprise; (3) a brief description of the purposes, means and methods of the RICO enterprise; (4) the area in which the enterprise operated; and (5) the approximate duration of the enterprise. Furthermore, as explained below, the indictment provides ample detail regarding the alleged predicate acts of the RICO enterprise. The Court finds that the indictment, by itself, fully satisfies the specificity requirements of Rule 7. The defendants are not entitled to a bill of particulars setting forth the "whens," "wheres," and "with whoms" regarding the Nasty Boys enterprise and conspiracy. *See Jimenez,* 824 F.Supp. at 363; *United States v. Gambino,* 809 F.Supp. 1061, 1071 (S.D.N.Y.1992); *United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y.1983); *see also Torres,* 901 F.2d at 233–34 (affirming denial of request for bill of particulars seeking the date defendant joined narcotics conspiracy, the identities of the coconspirators, and the precise dates and locations relating to overt acts involved in the conspiracy).

■ Second, with respect to the RICO predicate acts alleged in Count One and the violent acts in aid of racketeering charged in Counts Three through Twenty–Nine, the indictment sets forth: (1) the names and aliases of the defendants charged with the violent acts; (2) the dates of each alleged violent act; (3) the nature of each violent act (e.g. murder, attempted murder); and (4) the names and aliases of most of the victims of the alleged violent acts.[13] The Government has supplemented the indictment by providing the defendants with autopsy reports, crime scene photographs, crime scene diagrams, and firearms and ballistics evidence. Furthermore, in support of its motion for an anonymous jury, the Government provided additional detail regarding Racketeering Acts Two through Ten and Twelve, the murders of Rafael Cruz, Angel Luis Rivera, Nelson Pacheco, Henry Cruz, Antonio Flores, Julio Flores, Carlos Sanchez, Raymond Sanchez, the conspiracy to murder Diego Garcia,

---

**13.** The indictment does not set forth the names of the gang members targeted by the Wolfpack attack or the rival gang attack.

and the attacks on the Wolfpack gang and the unnamed rival gang. *See Finnegan Aff.* ¶¶ 6–9.

As noted above, the indictment does not provide the defendants with the names of the gang members targeted by the Wolfpack attack or the rival gang attack. However, the indictment sets forth the date of the attacks, the names of the defendants charged in the attacks, and the nature of each attack. The Affirmation also describes the circumstances of each attack in some detail. The Affirmation states that:

> [T]he defendants, armed with an array of firearms, dr[ove] in several vehicles to areas in the Bronx that were believed to be frequented by members of rival gangs who had, in some way, shown disrespect for the Nasty Boys. These shootings are charged in Racketeering Act 6 and Counts 11 and 12 (the Wolfpack Attack) and Racketeering Acts 9 and 10 and Counts 17 to 20 (the Rival Drug Gang Attack and murders of the Sanchez brothers). In both instances, the defendants and their co-racketeers drove in a caravan to the block where they believed they would find members of the other gang, and indiscriminately opened fire on everyone standing in the area, including bystanders who had no connection to the drug gangs. Numerous people were badly injured in both shootings and, in the second incident, two of the bystanders, Carlos and Raymond Sanchez, were killed in the hail of gunfire.

Finnegan Aff. ¶ 7. To the extent that the defendants request additional details regarding these and other racketeering acts, the Court finds such a request to be without merit. The Government is not required to provide further specifics regarding the particular acts in which the defendants are alleged to have participated, or for which they are being held responsible. *See Jimenez,* 824 F.Supp. at 363.

Third, with respect to the narcotics conspiracy count, the indictment provides the defendants with: (1) the names and aliases of the defendant members of the conspiracy; (2) the approximate duration of the conspiracy; (3) numerous overt acts in furtherance of the conspiracy; (4) the locations of the overt acts; (5) the types of narcotics involved in the overt acts; and (6) descriptions of each defendant's role in the overt act. Although the Government is not even required to prove a single overt act in furtherance of a narcotics conspiracy, *see United States v. Shabani,* —— U.S. ——, ——, 115 S.Ct. 382, 386, 130 L.Ed.2d 225 (1994), the indictment sets forth seven overt acts in the narcotics conspiracy count. Because the Government is not required to charge overt acts in the indictment, the information provided on the face of Count Thirty "is, itself, more detailed than defendants have a right to demand with respect to the overt acts enumerated therein." *Feola,* 651 F.Supp. at 1133; *see Jimenez,* 824 F.Supp. at 363–64. Moreover, the Government has supplemented the information contained in the indictment by allowing the defendants to inspect narcotics seized from various coconspirators. They have also provided the defendants with vouchers indicating the dates of the seizures and the persons from whom the narcotics were seized, and laboratory reports indicating the types, amounts and purities of the seized narcotics. The indictment and additional pretrial disclosures provide ample information regarding the alleged narcotics conspiracy to allow the defendants to prepare a defense, avoid unfair surprise and prevent a second prosecution for the same offense. *See GAF Corp.,* 928 F.2d at 1260.

Fourth, with respect to the firearm counts, the indictment states: (1) the names and aliases of each defendant charged with the firearm offense; (2) the date or approximate dates of the firearm offense; and (3) the violent crime or the narcotics crime to which the firearm offense relates. As discussed in the preceding paragraphs, the indictment provides ample detail regarding the violent crimes and the narcotics crime to which the various firearms offenses relate. Furthermore, the Government has provided the defendants with evidence relating to firearms and ballistics. The indictment coupled with the additional pretrial disclosures sufficiently advise the defendants of the specific acts of which they are accused. *See Torres,* 901 F.2d at 234.

■ Nevertheless, defendant William Delvalle argues that the indictment is too vague with respect to Count Forty–Three because it merely informs the defendants that they used or carried firearms in relation to the narcotics conspiracy which lasted from in or about 1991 up to and including October 31, 1995. He claims that to defend himself against this charge, he must be prepared to show that he did not carry or use a firearm during the entire duration of the conspiracy.[14] Thus, he argues, the Government should particularize the dates and times he is alleged to have used or carried a firearm in relation to the narcotics conspiracy.[15] A bill of particulars confines the Government's proof at trial to the particulars furnished. *See United States v. Perez,* 940 F.Supp. 540, 550–51 (S.D.N.Y.1996) (citing *United States v. Glaze,* 313 F.2d 757, 759 (2d Cir.1963)); *Feola,* 651 F.Supp. at 1132. Therefore, a request for a bill of particulars should be denied when it would unduly restrict the Government's ability to present its case. *Perez,* 940 F.Supp. at 550–51; *Jimenez,* 824 F.Supp. at 363; *Feola,* 651 F.Supp. at 1132. At oral argument, the Government explained that its witnesses will testify that the defendants carried firearms in relation to their narcotics dealing, but they may not be able to specify the dates on which the defendants carried firearms. If the Court were to grant Delvalle's request for particulars, it might preclude the Government from using proof it may develop as the trial approaches. Accordingly, his request must be denied.

■ In considering a request for a bill of particulars, "[t]he important question is whether the information sought is necessary" to the defense. *LaMorte,* 744 F.Supp. at 577. The numerous particulars requested by the defendants are not necessary to their defense. The information provided in the indictment, in the Finnegan Affirmation and through discovery, will allow the defendants to prepare their defense and avoid unfair surprise. Therefore, the defendants' requests for particulars regarding the various counts in the indictment are denied.

## B. Additional Discovery

Defendants Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa and Antonio Feliciano seek additional discovery, including a list of confidential informants, cooperating witnesses and all other Government witnesses. They also request that the Government's informants and cooperating witnesses be made available to them for interviews prior to trial.

### 1. Confidential Informants

■ The Supreme Court has held that when "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). However, the Government is not required to disclose the identity of a confidential informant unless the defendant shows that the informant's testimony is "material to the defense." *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.1988), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989); *see DiBlasio v. Keane,* 932 F.2d 1038, 1041–42 (2d Cir.1991); *United States v. Russotti,* 746 F.2d 945, 949 (2d Cir.1984) ("[A]n informant's identity need not be disclosed unless 'essential to the defense.'" (quoting *Scher v. United States,* 305 U.S. 251, 254, 59 S.Ct.

---

**14.** Another one of Delvalle's arguments belies this claim. He maintains that he was incarcerated from October 1992 until the present. This narrows the time frame during which Delvalle, himself, could have carried or used a firearm in relation to the alleged narcotics conspiracy.

**15.** He also asks the Government to particularize the place where he is alleged to have used or carried a firearm in relation to the narcotics conspiracy. The detail provided by Count Thirty, the narcotics conspiracy count, adequately specifies the locations where the narcotics conspiracy allegedly operated, and therefore, it adequately informs the defendant of the places where he allegedly used or carried a firearm. The indictment alleges that William Delvalle acted as a manager of heroin and crack sales in the vicinities of 878 Bryant Avenue, 1314 Seneca Avenue, 179th Street and Hughes Avenue, and Watson Avenue and Boynton Avenue in the Bronx, New York. The indictment provides similar information regarding the other defendants charged in Count Forty–Three. This request is, therefore, denied.

174, 176, 83 L.Ed. 151 (1938))). The defendant bears the burden to demonstrate the need for the "extraordinary remedy of disclosure." *Ortega v. United States,* 897 F.Supp. 771, 780 (S.D.N.Y.1995). A defendant does not satisfy this burden by merely showing that the informant was a participant in and witness to the crime charged. *Saa,* 859 F.2d at 1073 (citing *United States v. Jimenez,* 789 F.2d 167 (2d Cir.1986)).

▇▇▇ The defendants have failed to satisfy their burden of showing that the testimony of any confidential informant would be material to their defense. They argue that it is likely that the informants will provide the only direct evidence in the case and that their testimony will be key. "Mere speculation, however, that the informer may possibly be of some assistance does not overcome the strong public interest in protecting informants." *United States v. Martinez,* 634 F.Supp. 1144, 1150 (S.D.N.Y.1986). Accordingly, these motions are denied.[16]

## 2. Witness Lists

▇▇▇ Although Rule 16 of the Federal Rules of Criminal Procedure does not require the Government to disclose the identity of its prospective witnesses, the District Court has the authority to compel such disclosure. *United States v. Cannone,* 528 F.2d 296, 300 (2d Cir.1975). To obtain a list of the Government's witnesses, a defendant must make a *"specific* showing that disclosure ... [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *Id.* at 301; *see United States v. Bejasa,* 904 F.2d 137, 139–40 (2d Cir.), *cert. denied,* 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990); *United States v. Love,* 859 F.Supp. 725, 739 (S.D.N.Y.1994) ("The government may be required to produce a witness list only if the defendant makes a 'particularized showing of need.'" (quoting *United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y.1983))). A defendant does not satisfy this burden by claiming that a witness list would be helpful.

*See Love,* 859 F.Supp. at 739 (citing *United States v. Nezaj,* 666 F.Supp. 494, 503 (S.D.N.Y.1987)). "Especially in narcotics cases, where the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great, the defendant's requests for a witness list should not be granted absent a particularized showing of need." *United States v. Taylor,* 707 F.Supp. 696, 703 (S.D.N.Y.1989) (citations omitted). Because the defendants have made no such specific showing, the request is denied.

## 3. Rule 16 Discovery Requests

The defendants demand various materials pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The Government has represented to the Court that it has and will continue to comply with its Rule 16 discovery obligations. The Court has received a copy of the Government's comprehensive discovery index dated October 21, 1996. Based on the foregoing, the defendants' motions are denied. However, if the Government fails to comply with its discovery obligations in any way, the Court will take appropriate measures at trial pursuant to Rule 16(d)(2) of the Federal Rules of Criminal Procedure.

## CONCLUSION

For the reasons stated above, the Government's motion for an anonymous, semi-sequestered jury is GRANTED. It is HEREBY ORDERED that (1) *voir dire* will be limited so that the potential jurors on the *voir dire* panel, and the jurors and alternates selected to serve at trial, do not reveal their names, addresses, or places of employment; (2) during the trial, the jurors will be kept together during recesses, and the United States Marshals Service will provide lunch for the jurors as a group or take the jurors to lunch as a group each day; and (3) at the end of each trial day, the United States Marshals Service will transport the jurors together from the Courthouse to an undisclosed central location, from which they can leave for their respective communities. De-

---

**16.** The Government has represented that it intends to call all of its confidential informants to testify at trial. Moreover, the Government will be disclosing impeachment material one week prior the testimony of each witness. The Court finds that this procedure will allow the defendants to conduct a meaningful defense.

fendant William Delvalle's motion for severance is DENIED. The motions of Jose Muyet, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa, and Antonio Feliciano seeking a bill of particulars are DENIED. The motions of Pedro Narvaez, Julio Matias, William Delvalle and Antonio Feliciano seeking a list of confidential informants are DENIED. The motions of Pedro Narvaez, Julio Matias and Antonio Feliciano seeking a list of Government witnesses are DENIED. The motions of Pedro Narvaez, Julio Matias, Frank Sosa, and Antonio Feliciano seeking additional discovery are DENIED. To the extent that the individual defendants have joined in the motions made by all other codefendants, those motions are DENIED for the reasons stated above.

**SO ORDERED.**