### UNITED STATES of America,

#### v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," Ayman al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed

the defendant.

Rashed Daoud Al–'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(6) 98 CRIM. 1023 (LBS).

United States District Court,
S.D. New York.

March 15, 2000.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Kenneth Karas, Patrick Fitzgerald, Michael J. Garcia, Paul Butler, Assistant United States Attorneys.

Paul McAllister, Charles D. Adler, George Goltzer, New York City, for defendant Salim.

James Roth, Lloyd Epstein, New York City, for defendant Mohamed.

Samuel Schmidt, Joshua Dratel, Deborah I. Meyer, New York City, for defendant El Hage.

Michael Young, Carl J. Herman, Sandra L. Babcock, New York City, for defendant Odeh.

Leonard Joy, Robert Tucker, Mark Gombiner, David Bruck, New York City, for defendant Al–'Owhali.

Jeremy Schneider, David Stern, David Ruhnke, New York City, for defendant Khamis Mohamed.

## MEMORANDUM AND ORDER

SAND, District Judge.

Defendants are charged with numerous offenses arising out of their alleged involvement with an international terrorist organization led by Defendant Usama Bin Laden ("Bin Laden"). Presently before the Court are four motions, filed by Defendants Wadih El Hage ("El Hage"), Mamdouh Mahmud Salim ("Salim"), Mohamed Sadeek Odeh ("Odeh"), and Khalfan Khamis Mohamed ("K.K.Mohamed") seeking an order compelling the Government to file a bill of particulars that is responsive to over 150 separate requests for information. For the reasons set forth below, those motions are granted in part and denied in part. The Government is ordered to file a bill of particulars, but that bill need only be responsive to those specific requests that we identify below.

### I. BACKGROUND

The indictment presently before the Court, S(6) 98 Cr. 1023(LBS) (the "Indictment"), charges the 15 named Defendants with 267 discrete criminal offenses. Eleven of the Defendants (all except Salim, Khaled Al Fawwaz ("Al Fawwaz"), Ali Mohammed, and El Hage) are charged with 229 counts of murder (*see id.* at ¶¶ 40–59), as well as nine other substantive offenses [1] (*see id.* at ¶¶ 32–39, 56–65), based on the August, 1998 bombings of the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Defendant El Hage is charged with twenty counts of perjury before a federal grand jury and three counts of making false statements to

---

[1] In a prior opinion, this Court ordered two of those substantive offenses (two counts of maiming) as well as two of the murder counts to be dismissed for lack of jurisdiction. *See United States v. Bin Laden,* 92 F.Supp.2d 189 (S.D.N.Y. 2000).

special agents of the Federal Bureau of Investigation ("FBI"). (*See id.* at ¶¶ 66–96.)

Each of the Defendants is also charged with participating in at least five distinct criminal conspiracies; El Hage and Ali Mohamed are accused of participating in six. (*See id.* at ¶¶ 10–31.) Although each conspiracy is charged under a different provision of the federal criminal code,[2] the allegations overlap to a significant degree. The six conspiracies are, for the most part, alleged to have had the same four criminal objectives: (1) murder of United States nationals; (2) killing of United States military personnel serving in Somalia and on the Saudi Arabian peninsula; (3) killing of United States nationals employed at the United States Embassies in Kenya and Tanzania; and (4) concealment of the conspirators' activities through the use of front companies, false identity and travel documents, coded correspondence, and by providing false information to authorities. (*See id.* at ¶¶ 11, 15, 19.)[3] All but one[4] of the conspiracies are alleged to have been furthered by the commission of the same set of 144 overt acts. (*See id.* at ¶ 12.)

In a section labeled, "Background," the Indictment explains that the charges arise out of the Defendants' alleged involvement with a vast, international terrorist network known as "al Qaeda," or "the Base." (*See id.* at ¶ 1.) According to the Indictment, al Qaeda emerged in 1989, under the leadership of Bin Laden and his two chief military commanders, Defendant Muhammad Atef ("Atef") and the now-deceased, Abu Ubaida al Banshiri ("Abu Ubaidah"), replacing a predecessor organization known as "mekhtab al khidemat," or the "Services Organization." (*Id.* at ¶¶ 1, 6–7.) Members of al Qaeda "pledged an oath of allegiance (called a '*bayat*') to Bin Laden and al Qaeda." (*Id.* at ¶ 1.) The group was allegedly headquartered in Afghanistan from 1989 until 1991, at which time it re-located to the Sudan, ultimately returning to Afghanistan in 1996. (*See id.*) According to the Indictment, al Qaeda functioned both on its own and in conjunction with other groups—such as the "al Jihad" organization in Egypt, Sheik Omar Abdel Rahman's[5] "Islamic Group," the Iranian terrorist group, Hezballah, and the Sudanese National Islamic Front—that shared its strong opposition to the United States and a willingness to use violent, terrorist tactics in furtherance of their shared goals. (*See id.* at ¶¶ 2, 4–5, 8.)[6]

2. Count One alleges a conspiracy to kill United States nationals, in violation of 18 U.S.C. § 2332(b); Count Two accuses El Hage and Ali Mohamed of conspiring to murder, kidnap, and maim United States nationals outside of the United States, in violation of 18 U.S.C. § 956(a); Count Three alleges a conspiracy to commit murder, in violation of 18 U.S.C. §§ 1111, 1114, and 1116; Count Four charges the defendants with conspiring to use weapons of mass destruction against United States nationals, in violation of 18 U.S.C. §§ 2332a(a)(1) and 2332a(a)(3); Count Five charges a conspiracy to destroy buildings and property, in violation of 18 U.S.C. § 844(f); and Count Six accuses the defendants of conspiring to attack national defense utilities, in violation of 18 U.S.C. §§ 2155(a) and 2155(b).

3. Count Four lists only the bombing of the embassies and attacking "American military facilities in the Gulf Region and the Horn of Africa, and members of the American military stationed in Saudi Arabia, Yemen, Somalia and elsewhere with bombs" as the objects of the conspiracy. (Indictment at ¶ 23.) Count Six does not separately set forth the objects of the conspiracy. (*See id.* at ¶¶ 29–31.)

4. The Indictment expressly states that several of the overt acts alleged were not acts in furtherance of the conspiracy charged in Count Six. (*See id.* at ¶ 31.)

5. Sheik Rahman has previously been convicted of conspiring to commit acts of terrorism against the United States. *See United States v. Rahman,* 189 F.3d 88 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 439, 145 L.Ed.2d 344 (1999).

6. Defendant Salim is charged with attending various meetings with an "Iranian religious official," and with "a ranking official in the National Islamic Front" to arrange a tripartite agreement between al Qaeda, the National Islamic Front, and "elements of the Government of Iran to work against the United States, Israel, and other Western countries."

The Indictment's core factual allegations are set forth in a 31–page section that appears under the heading "Overt Acts." (*See id.* at ¶ 12.) Without re-stating the entire litany of acts alleged therein, it is fair to say that the basic pattern that emerges is one in which al Qaeda, over a period of at least ten years, is said to have organized, financed, inspired, and generally facilitated a variety of violent attacks against United States personnel and property abroad. Some of the overt acts set forth in the Indictment, such as detonation of the explosives that destroyed the American embassies, are plainly violent acts in and of themselves. But many of the overt acts alleged consist of seemingly non-criminal conduct—such as writing letters, traveling, and engaging in business transactions—which, according to the Indictment, facilitated the violent attacks and thereby constitute overt acts in furtherance of the charged conspiracies.

## A. The Organization

The Indictment alleges that beginning at least in 1989, al Qaeda established "training camps" and "guesthouses" in various areas around the world, including Afghanistan, Pakistan, the Sudan, Somalia, and Kenya. (*See id.* at ¶ 12a.) Al Qaeda members and the members of affiliated groups allegedly received military[7] and intelligence training in those camps under the direction of Defendant Ali Mohamed and others. (*Id.* at ¶ 12c). Defendant Salim allegedly managed some of the camps in Afghanistan and Pakistan. (*See id.* at ¶ 12a).

The camps were allegedly operated under the auspices of a series of business established by Bin Laden, Salim, and others. (*Id.* at ¶ 12d.) The businesses were used to engage in activities such as purchasing land, warehouses, and equipment for the camps; and for transporting currency and weapons[8] to al Qaeda members "in various countries throughout the world." (*Id.*)

Assistance from American citizens was allegedly essential to al Qaeda's operation. Two of the Defendants, Ali Mohamed and El Hage, both American citizens, are accused of assisting the organization by traveling "throughout the Western world to deliver messages and engage in financial transactions for the benefit of al Qaeda...." (*Id.* at ¶ 12b.) According to the Indictment, Ali Mohamed and El Hage exchanged messages with each other, and with other co-conspirators, through letters (*see id.* at ¶¶ 12tt, 12uu, 12uuu, 12bbbb, 12gggg) and visits (*see id.* at ¶¶ 12xx), regarding al Qaeda activities and the whereabouts of al Qaeda leaders (*see id.* at ¶¶ 12zz, 12nnn–12ttt, 12xxx, 12bbbb).

## B. The Fatwahs and Declarations of Jihad

In addition to providing military and intelligence training, obtaining weapons, establishing base camps, and coordinating the work of various members around the globe, al Qaeda allegedly facilitated violent attacks on United States interests by providing religious authority for those attacks. From time to time, according to the Indictment, Bin Laden would issue rulings on Islamic law, called "fatwahs," which purported to justify al Qaeda's violent activities. Defendant Salim is accused of supplementing these efforts by allegedly lecturing other members about the appropriateness under Islamic law of engaging "in violent actions against 'infidels.'" (*See

---

(*See id.* at ¶¶ 12i–12l; *see also id.* at ¶ 12eeeee (charging Defendant Odeh with discussing "the fact that Usama Bin Laden had formed a united front against the United States with other Islamic extremist groups").)

7. For instance, Defendant Odeh allegedly received "explosives training" in various camps in Afghanistan, including al Qaeda camps. (*See id.* at ¶ 12g.)

8. For example, "[o]n at least two occasions" between 1992 and 1995 "members of al Qaeda transported weapons and explosive from Khartoum in the Sudan to ... Port Sudan for transshipment to the Saudi Arabian peninsula." (Id. at ¶ 12z.) Bin Laden is also accused of attempting to obtain the component parts for chemical and nuclear weapons. (*See id.* at ¶ 12bb–12cc.).

*id.* at ¶ 12aa.) Defendant Al Fawwaz, working out of at Qaeda's London office[9] (which he allegedly established in 1994 (*see id.* at ¶ 12qq)), would distribute Bin Laden's messages around the globe. (*See id.* at 12iii.)

The Indictment identifies a number of fatwahs allegedly issued by Bin Laden. The first, issued some time after 1992, was that the United States forces stationed on the Saudi Arabian peninsula should be attacked. (*See id.*) In 1992 or 1993, Bin Laden allegedly issued another fatwah stating that United States forces stationed in "the Horn of Africa, including Somalia, should be attacked." (*Id.* at ¶ 12m.)[10] Next, according to the Indictment, on August 23, 1996, Bin Laden issued a "Declaration of Jihad from Afghanistan Against the Americans occupying the Land of the Two Holy Mosques." (*Id.* at ¶ 12ggg.) The Declaration was subtitled "Expel the Heretics from the Arabian Peninsula." (*Id.*)

Finally, in February, 1998 Bin Laden issued another fatwah, eliminating the distinction between military and civilian personnel and stating that "Muslims should kill Americans—including civilians—anywhere in the world where they can be found." (*Id.* at ¶ 12jjjj.) A few months later, in May, 1998, Bin Laden endorsed a fatwah characterizing the United States Army as "the 'enemies of Islam'" and declaring a "jihad" against the United States "and its followers." (*Id.* at ¶ 12llll.) That same month, according to the Indict-

ment, Bin Laden held a press conference, attended by Defendants Atef and Al-'Owhali, in which he re-iterated his "intention to kill Americans." (*Id.* at ¶ 12tttt.)

## C. The Violent Attacks

### 1. Somalia

Under the leadership of Defendants Atef, Fazul Abdullah Mohamed ("F.A.Mohamed"), Odeh, and the now deceased, Abu Ubaidah, al Qaeda allegedly provided military training and assistance in its camps to Somali tribes opposed to the U.N. peacekeeping mission in that country. (*See id.* at ¶¶ 12p–12q.) On October 3 and 4, 1993, the Indictment alleges, those persons they trained "participated in an attack on United States military personnel serving in Somalia as part of Operation Restore Hope, which attack resulted in the killing of 18 United States Army personnel...." (*Id.* at ¶ 12y.)

### 2. The East African Bombings

The Indictment includes roughly parallel allegations with respect to the bombings in Kenya[11] and Tanzania. During the spring and early summer of 1998, al Qaeda members and other co-conspirators began to congregate in both Nairobi and Dar es Salaam. Defendant Fahid Mohammed Ally Msalam ("Msalam") and an unindicted co-conspirator that the Government identifies as "Azzam," (*id.* at ¶ 12vvvv) congregated in Nairobi; Defendants K.K. Mohamed and Mustafa Mohamed Fadhil

---

**9.** El Hage also is accused of visiting Defendant Al Fawwaz in London (*see id.* at ¶¶ 12yy), after Al Fawwaz had established al Qaeda's office in that city, in furtherance of the organization's goals.

**10.** Defendant Salim allegedly delivered lectures to that effect as well. (*See id.* at ¶ 12n.)

**11.** The Nairobi bombing, however, is alleged to have been planned for a longer period of time. Towards the end of 1993, the Indictment alleges, al Qaeda established a Kenyan cell of operations. "[V]arious members," including Defendants Al Fawwaz, Odeh, and El Hage, moved to Narirobi and established businesses and residences. (*See id.* at ¶¶ 12r–

12x.) One such business, a fishing business, allegedly established by Odeh in 1994, was used "to support al Qaeda members in Kenya." (*Id.* at ¶ 12t.) Beginning as early as late 1993 and early 1994, various al Qaeda members in Nairobi discussed, and planned, an attack on the United States Embassy in that city. (*See id.* at ¶¶ 12ii–12oo.) El Hage is also accused of traveling to the Sudan in June and July of 1997 to obtain money to support the operations of al Qaeda's Kenyan cell (see id. at ¶¶ 12vvv–12www.) Towards the end of 1996 and early part of 1997, El Hage allegedly traveled from Kenya to Pakistan, allegedly to meet with Al Qaeda leaders, including Defendant Atef. (*See id.* at ¶¶ 12kkk–12mmm.)

("Fadhil") met in Dar es Salaam. One of the first tasks for each group was to purchase a truck and make necessary alterations to prepare the truck for use with a bomb. Defendant Sheikh Ahmed Salim Swedan ("Swedan") is charged with purchasing both trucks, assisted in Nairobi by Msalam (*see id.* at ¶ 12yyyy) and assisted in Dar es Salaam by Defendant Ahmed Khalfan Ghailani ("Ghailani") (*see id.* at ¶¶ 12aaaaa–12bbbbb).

During the first week in August, final preparations were made. Defendants Al–'Owhali and F.A. Mohammed, along with Azzam, made those preparations at a villa in Nairobi (*see id.* at ¶ 12nnnnn); Defendants Fadhil, K.K. Mohamed, and Msalam, along with an unindicted co-conspirator identified only as "CS–2" made preparations in Dar es Salaam. (*See id.* at ¶ 12kkkkk.) On the night before the bombings, pursuant to the advice of an unidentified "al Qaeda member" (*id.* at ¶ 12lllll), Defendants Odeh, Msalam, and Ghailani left Nairobi under assumed names and traveled to Karachi, Pakistan. (*See id.* at ¶¶ 12vvvvv–12wwwww.) Early the next morning, claims of responsibility were sent by fax to London, England for further distribution by unidentified co-conspirators. (*See id.* at ¶ 12xxxxx.)

Finally, on August 7, 1998, separated in time by only ten minutes, the two bombs were detonated. In Nairobi, they were allegedly detonated by Azzam and F.A. Mohammed, accompanied by Al–'Owhali (*see id.* at ¶¶ 12yyyyy, 12aaaaaa–12bbbbbb); in Dar es Salaam, they were detonated by an unindicted co-conspirator, identified by the Government as "Ahmed the German," (*see id.* at ¶ 12dddddd). In the immediate aftermath of the bombing, Defendant F.A. Mohammed allegedly

cleaned out the villa in Nairobi where preparations had been made and traveled to the Comoros Islands. (*See id.* at ¶ 12ggggggg.)

Also in the aftermath of the bombing, Defendant El Hage—who had testified about al Qaeda before a federal grand jury upon his return to the United States from Kenya approximately one year earlier (*see id.* at ¶ 12dddd)—was subpoenaed to appear before a federal grand jury investigating the bombings. On both occasions, El Hage was also interviewed by special agents of the FBI. The Indictment accuses Mr. El Hage of making a wide variety of false statements both to the FBI agents (*see id.* at ¶ 12cccc) and to the grand jury, in both 1997 (*see id.* at ¶ 12dddd) and 1998 (*see id.* at ¶ 12eeee).

## D. Procedural History

On September 16, 1998, following his testimony before the Grand Jury, Defendant El Hage was arrested by federal authorities. He was incarcerated pursuant to certain special conditions of confinement, which federal regulations authorize for particularly dangerous detainees. *See* 28 C.F.R. § 501.3(a) (1999). In this case, those conditions have included periods of solitary confinement,[12] as well as severe restrictions on the Defendants' access to visitors and to the telephone. Defendants Odeh and Al–'Owhali were next brought into federal custody, and first appeared before the Court on October 8, 1998. Salim first appeared on December 21, 1998, after having been arrested in Germany on September 6, 1998. Ali Mohamed first appeared on May 27, 1999 and K.K. Mohamed was arraigned before this Court on October 8, 1999. Since being brought into

12. In response to the complaints raised by Defendant El Hage in the course of his most recent application for bail, the Government permitted Mr. El Hage to be housed with a roommate, co-defendant Salim. (*See* Transcript of Proceedings, Jan. 10, 2000, at 11.) The Court has also been informed that the Government consented to a request by Defendant Al–'Owhali to share a cell with co-Defendant K.K. Mohamed. (*See* Letter from Fitzgerald to Joy of Feb. 2, 2000.) Additional accommodations with respect to recreational opportunities for the Defendants appear to have been made in recognition of the protracted nature of pre-trial litigation. (*See* Letter from Fitzgerald to the Court of Jan. 21, 2000.)

232

federal custody, each of those Defendants has also been incarcerated pursuant to the particularly restrictive conditions described above.

The process of preparing for a trial in this case has been unusually protracted. The complexity of the charges, the voluminous discovery that needs to be exchanged, the location of many relevant documents and witnesses in various countries around the world, special procedures for handling classified material, the need to translate literally thousands of documents, and the potential availability of capital punishment for some of the Defendants have combined to require an extraordinary amount of work on the part of all parties involved. Despite everyone's best efforts, it is anticipated at this time that the earliest possible date that this case could be ready for trial is September 5, 2000—almost two years after the first Defendant was brought into custody and incarcerated under restricted conditions.[13] Trial of the guilt phase of this case, excluding jury selection and deliberation, is expected to last at least six months. (*See* Transcript of Proceedings, September 28, 1999, at 13.)

Four of the Defendants—El Hage, Salim, Odeh, and K.K. Mohamed—now move for an order requiring the Government to file a bill of particulars. Together, the Defendants have requested more than 150 specific items of information that they wish to be included in that bill. The Defendants contend that the filing of a bill of particulars responsive to those requests is necessary to permit them to prepare a

defense and to prevent prejudicial surprise at trial. The Government, on the other hand, in addition to challenging the appropriateness of a bill of particulars that includes the types of information requested by the Defendants, contends that it need not file a bill of particulars because the extensive detail included in the Indictment, the voluminous discovery it has provided to date,[14] and the additional disclosures provided in its response to Mr. El Hage's bail application more than adequately apprise the Defendants of the charges that they must be prepared to answer.

## II. DISCUSSION

### A. Legal Standard

General principles as to when the court should order the Government to file a bill of particulars are familiar and well settled. Federal Rule of Criminal Procedure 7(f) provides that:

The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

*Id.* Prior to 1966, the federal rules only permitted the court to direct the filing of a bill of particulars "for cause." That condition was eliminated "to encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases."

---

**13.** On December 1, 1999, El Hage filed an application for bail (his third), arguing that the duration of his highly restricted, pre-trial confinement constituted a violation of due process. That application was denied, on the basis of voluminous submissions by the parties and extensive oral argument. (*See* Transcript of Proceedings, Jan. 10, 2000, at 40.) The Government's submission, which included a 71–page affirmation with 39 attached exhibits, (*see* Affirmation of Patrick J. Fitzgerald of December 30, 1999) provided an extensive discussion of the Government's evidence against Mr. El Hage, and argument as to what that evidence demonstrated about Mr. El Hage's role in the offenses charged in the

Indictment. The Court of Appeals heard argument on the appeal of this Court's denial of bail on March 13, 2000.

**14.** "To date, the Government has provided hundreds of thousands of pages of documents, dozens of audio and video tapes, transcripts and translations of these materials, hundreds of crime scene and other photographs, several dozen laboratory reports reflecting forensic tests of thousands of items and numerous other FBI Reports." Brief for the United States at 21–22, *United States v. El Hage*, No. 00–1025 (2d Cir. Feb. 15, 2000) (opposing application for bail).

Fed.R.Crim.P. 7(f) advisory committee's note; *see also* 1 Charles Alan Wright, *Federal Practice and Procedure* § 129, at 646–48 (3d ed.1999) (discussing historical development of standard for ordering the filing of a bill of particulars).

■■■■ "Even under the amended rule a bill of particulars is not a matter of right." 1 Charles Alan Wright, *Federal Practice and Procedure* § 129, at 648 (3d ed.1999) (citations omitted). Whether to order the filing of a bill of particulars is a decision that rests within the sound discretion of the district court. *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999) (citing *United States v. Barnes*, 158 F.3d 662, 665–66 (2d Cir.1998)). In exercising that discretion, the court must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted.

Even the most cursory review of the many reported cases in which courts have examined a defendant's request for a bill of particulars reveals several general principles that are often repeated. For example, almost every court that considers the issue begins by noting that "[t]he function of a bill of particulars is to provide [a] defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990) (quoting 1 Charles A. Wright, *Federal Practice and Procedure* § 129, at 434–35 (2d ed.1982) and citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987) (per curiam)).[15] It is almost as frequently stated that "[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Id.* (quoting *United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)).[16] Many courts have observed that "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *id.*, and that it is not the bill's function "to allow defendants a preview of the evidence or the theory of the government's case," *United States v. Taylor*, 707 F.Supp. 696, 699 (S.D.N.Y.1989) (quoting *United States v. Guerrerio*, 670 F.Supp. 1215, 1225 (S.D.N.Y.1987) (internal quotation marks omitted)).[17] Finally, it is typically noted that "in deciding whether a bill of particu-

**15.** *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.1988) (citation omitted); *United States v. Rodriguez*, No. 99 Cr. 367(DLC), 1999 WL 820558, at *1 (S.D.N.Y. Oct. 13, 1999) (citations omitted); *United States v. Mittal*, No. 98 Cr. 1302(JGK), 1999 WL 461293, at *9 (S.D.N.Y. July 7, 1999) (citations omitted); *United States v. Gallo*, No. 98 Cr. 338(JGK), 1999 WL 9848, at *5 (S.D.N.Y. Jan. 11, 1999) (citations omitted); *United States v. Mango*, No. 96–CR–327, 1997 WL 222367, at *8 (N.D.N.Y. May 1, 1997) (citations omitted); *United States v. Muyet*, 945 F.Supp. 586, 599 (S.D.N.Y.1996); *United States v. Song*, No. 95 Cr. 129(KMW), 1995 WL 736872, at *6 (citations omitted); *United States v. Cruz*, No. S1 94 Cr. 313(CSH), 1995 WL 617220, at *1 (S.D.N.Y. Oct. 20, 1995); *United States v. Gambino*, No. 94 Cr. 687(HB), 1995 WL 453318, at *6 (S.D.N.Y. Aug. 1, 1995); *cf. United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir.1973) ("A bill of particulars is normally ordered by a trial judge ... to supplement an indictment cast in general terms."); *Nachamie*, 2000 WL 37993, at *3 ("A bill of particulars permits a defendant 'to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.' ") (quoting *Bortnovsky*, 820 F.2d at 574);

**16.** *See, e.g., Walsh*, 194 F.3d at 46; *Mittal*, 1999 WL 461293, at *9; *Gallo*, 1999 WL 9848, at *5; *Muyet*, 945 F.Supp. at 599; *Cruz*, 1995 WL 617220, at *1; *Gambino*, 1995 WL 453318, at *6.

**17.** *See, e.g., Barnes*, 158 F.3d at 665 ("[A] bill of particulars 'is not intended, as such, as a means of learning the government's evidence and theories....' ") (quoting 1 Charles Alan Wright, *Federal Practice and Procedure* § 129 (1982)) (internal quotation marks omitted); *Davidoff*, 845 F.2d at 1153 ("The prosecution need not particularize all of its evidence.") (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974)); *Nachamie*, 2000 WL 37993, at *3 ("The proper scope and function of a bill of particulars is not to obtain disclo-

lars is needed, the court must determine whether the information sought has been provided elsewhere, such as in other items provided by discovery, responses made to requests for particulars, prior proceedings, and the indictment itself." *Strawberry*, 892 F.Supp. at 526 (citing *Feola*, 651 F.Supp. at 1133).[18]

Once one focuses, however, on the details of a particular case, it becomes apparent that the foregoing, oft-repeated generalities provide little guidance. The line that distinguishes one defendant's request to be apprised of necessary specifics about the charges against him from another's request for evidentiary detail is one that is quite difficult to draw. It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars. *See Bortnovsky*, 820 F.2d at 575 ("providing mountains of documents to defense counsel" when the indictment contained general allegations of fraud "impermissibly shifted" the burden of proof to the defendants, necessitating a bill of particulars); *Nachamie*, 2000 WL 37993, at *4 (applying *Bortnovsky* and ordering filing of bill of particulars when government had produced "200,000 pieces of paper in hundreds of boxes and files"). It is not surprising, therefore, that more than one

court has observed that "the precedents furnish little help in disposing of requests for bills of particulars in criminal cases." *United States v. Metropolitan Leather & Findings Ass'n*, 82 F.Supp. 449, 454 (S.D.N.Y.1949); *see also Nachamie*, 2000 WL 37993, at *5 (noting that "[a] review of the case law in this district reveals no clear distinction among circumstances in which courts grant a request ..." in a particular circumstance) (citing *United States v. Killeen*, No. 98 Cr. 143, 1998 WL 760237, at *5 (S.D.N.Y. Oct. 29, 1998)); 1 Charles Alan Wright, *Federal Practice and Procedure* § 131, at 675–76 (3d ed.1999) (collecting cases containing similar comments).

Moreover, to whatever limited degree prior decisions are helpful as a general matter when resolving demands for a bill of particulars, they are particularly unilluminating in this case. The geographical scope of the conspiracies charged in the Indictment is unusually vast. The Indictment alleges overt acts in furtherance of those conspiracies that occurred in Afghanistan, Pakistan, the Sudan, Somalia, Kenya, Tanzania, Malaysia, the Philippines, Yemen, the United Kingdom, Canada, California, Florida, Texas, and New York. (*See generally* Indictment at ¶ 12.) The breadth and duration of the criminal conduct with which the alleged conspirators are accused is similarly widespread.

sure of evidence or witnesses to be offered by the Government at trial...") (quoting *United States v. Strawberry*, 892 F.Supp. 519, 526 (S.D.N.Y.1995) (citing *Salazar*, 485 F.2d at 1278)); *Rodriguez*, 1999 WL 820558, at *1 (citations omitted); *United States v. Sainato*, 33 F.Supp.2d 155, 161 (E.D.N.Y.1998); *Mango*, 1997 WL 222367, at *8 (citing *United States v. Walker*, 922 F.Supp. 732, 738 (N.D.N.Y.1996) (citing *United States v. Biaggi*, 675 F.Supp. 790, 809 (S.D.N.Y.1987))); *Muyet*, 945 F.Supp. at 599 (citing *United States v. LaMorte*, 744 F.Supp. 573, 577 (S.D.N.Y. 1990); *Song*, 1995 WL 736872, at *6 (citations omitted); *United States v. Jimenez*, 824 F.Supp. 351, 363 (S.D.N.Y.1993)); *United States v. DeSalvo*, 797 F.Supp. 159, 174–75 (E.D.N.Y.1992) ("Defendant clearly seeks to discover not just the contours of the case ... defendant seeks in detail the sort of arguments that the government will make to bol-

ster its arguments."); *United States v. Facciolo*, 753 F.Supp. 449, 451 (S.D.N.Y.1990) ("The government will not be compelled through a bill of particulars to disclose the manner in which it will prove the charges or preview its evidence or legal theory.").

18. *See, e.g., Walsh*, 194 F.3d at 47 (citing *Torres*, 901 F.2d at 234; *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir.1984)); *Barnes*, 158 F.3d at 665 (citing *Bortnovsky*, 820 F.2d at 574); *Nachamie*, 2000 WL 37993, at *3 (citations omitted); *Rodriguez*, 1999 WL 820558, at *1 (citation omitted); *Mittal*, 1999 WL 461293, at *9 (citations omitted); *Gallo*, 1999 WL 9848, at *5 (citations omitted); *Muyet*, 945 F.Supp. at 599 (citation omitted); *Song*, 1995 WL 736872, at *6 (citations omitted); *Cruz*, 1995 WL 617220, at *1 (citations omitted).

The Indictment alleges activity, occurring over a period of nearly ten years, that ranges from detonating explosives, to training Somali rebels, to transporting weapons, to establishing businesses, to lecturing on Islamic law, to writing letters, and to traveling, as overt acts in furtherance of the charged conspiracies. (*See id.*) We are hesitant, therefore, to place any significant weight on the conclusions reached in earlier cases in which courts were presented with an indictment alleging a more specific type of criminal conduct, occurring over a shorter period of time, in a more circumscribed geographical area. Although we express no view at this time as to whether the Indictment comports with the requirements of due process,[19] we recognize that it does impose a seemingly unprecedented and unique burden on the Defendants and their counsel in trying to answer the charges that have been made against them.

■ We believe that a bill of particulars is necessary in this case to permit the Defendants to prepare a defense and to prevent prejudicial surprise at trial. *See Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927). Specifically, for the reasons set forth below, we conclude that several of the allegations contained in the "Overt Acts" section of the Indictment are cast in terms that are too general, in the context of this particular case, to permit the Defendants to conduct a meaningfully directed investigation of the relevant facts and circumstances and be prepared to respond to the charges. The restrictive conditions of pre-trial confinement—to which all of the Defendants have now been subjected for at least several months (and one has been subjected for

almost two years)—while in our view lawful and necessary, are also a concern. To the extent that the filing of a bill of particulars will expedite Defendants' preparation for trial and permit a more efficient and expeditious resolution of this matter, the Court, in the exercise of its discretion, orders that such a bill be filed, but only to the extent set forth herein.

### A. Requests Pertaining to Conspiracy Charges

By far, the bulk of the Defendants' requests for particulars involve the six conspiracies charged in the Indictment. Many of the conspiracy-related requests seek particulars with respect to the Indictment's allegations of overt acts in furtherance of the charged conspiracies, many of which are described in general terms. Another large group of requests seek identification of co-conspirators.[20] A third category seeks detailed information about the formation of the conspiracies, when and how each defendant joined the conspiracies, and the role played by each Defendant in the various conspiracies.

### 1. Requests to Provide Specific Details about Allegations of Overt Acts in Furtherance of the Charged Conspiracies

The majority of the Defendants' conspiracy-related requests for particulars involve allegations contained in the Indictment's "Overt Acts" section. (*See* Declaration of Joshua L. Dratel, Esq. (the "Dratel Declaration") at ¶¶ 7(w)–(mmmm); Letter from Goltzer to Fitzgerald of November 17, 1999, attached as Ex. A to Salim's Notice of Motion (the "Goltzer Letter") at ¶¶ 13–31.[21]) The Court has carefully reviewed

---

**19.** That question, raised by Defendant Al-'Owhali's motion to dismiss the Indictment, will be addressed in a separate, forthcoming opinion.

**20.** To some extent these two categories overlap; that is, the Defendants seek particulars with respect to general allegations and identification of the co-conspirators named therein. Where this is the case, we instruct the Government to identify co-conspirators in accor-

dance with the instructions *infra* at Part IIA(2), but to provide any other requested details in accordance with Part IIA(1).

**21.** The Goltzer Letter actually contains two separately enumerated lists of paragraphs. For the purpose of this discussion, all of the references made herein to paragraph numbers refer to the numbered list of paragraphs that appears under the heading "Bill of Particulars," pp. 10–13.

each of those allegations and has considered whether the requested particulars are necessary. With respect to some of the allegations—those which are described in general terms that refer to so broad a class of activity that they would require an exceedingly extensive investigation by defense counsel—we conclude that a bill of particulars is required.

We find some guidance in the decisions rendered in *Bortnovsky* and *Nachamie.* In *Bortnovsky,* the defendants were charged with submitting fraudulent insurance claims. *See Bortnovsky,* 820 F.2d at 573. The indictment alleged, generally, that "[t]he defendants would and did submit false claims ..." for "burglary losses" and "fire damage," but never identified which of the many claims filed by the defendants with their insurance carrier were allegedly fraudulent. *Id.* at 574. The government provided the defendants with over 4,000 documents during discovery, but never identified which of those documents would be the basis for its claims at trial. *See id.* Finding that the combination of general allegations with extensive discovery, "in effect" shifted the burden of proof to the defendants, the Court of Appeals reversed the conviction on the ground that the denial of the defendant's request that the court order the filing of a bill of particulars was an abuse of discretion. *See id.* at 574–75. Similarly, in *Nachamie,* "[t]he Government ... produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims," but never "informed the defendants which of the[ ] claims were false and in what way they were false." *Nachamie,* 2000 WL 37993, at *4. Noting the similarity to the situation in *Bortnovsky, see id.,* the court ordered

the government to identify which of the Medicare claims were fraudulent, but "only with regard to those claims that the Government intends to prove at trial." *Id.* at *7.

In this case—in which the charged conspiracies involve a wide range of conduct, occurring over a long period of time, in various countries around the world—the Indictment alleges that some of the Defendants participated in the charged conspiracies by committing overt acts in furtherance thereof which are described only in terms as general as engaging in "travel" and conducting "business." We believe that because those terms refer to such broad categories of conduct, those allegations provide too little information to the Defendants and their counsel to permit them reasonably to focus their trial preparations, especially in light of the voluminous amount of material that has been produced in discovery to date. We therefore direct the Government to file a bill of particulars that is responsive to the following requests submitted by defense counsel: (1) that contained in the Dratel Declaration at ¶ 7(nnnnn) (seeking particulars as to all "travel by Mr. El Hage [that] is alleged to have been made in furtherance of the conspiracies charged against him in the Indictment") and (2) that contained in the Dratel Declaration at ¶ 7(ooooo) (seeking particulars as to which "businesses and/or organizations by which Mr. El Hage was employed [that] operated as 'fronts' for al Qaeda....")[22]

The Government argues, in opposition to the Defendants' motions, that, at least in some instances, its information might not be sufficiently specific to permit it to file a bill that is responsive to the Defendants'

---

**22.** We do not direct the Government to respond to El Hage's similar request to identify "what activities performed by Mr. El Hage on behalf of those business and/or organizations ... were performed in furtherance of the conspiracies charged against him" (*id.* at ¶ 7(ppppp)) as well as various other requests made by El Hage to specify the roles played by various members of the conspiracy (*see id.* at ¶¶ 7(qqqqq)–(vvvvv)). As is more fully set

forth below, *see infra* Part IIA(3), the jury is entitled to draw inferences about whether and how particular activities furthered a conspiracy without direct proof from the Government. We do not believe it is appropriate therefore to require the Government to articulate in a bill of particulars, the way in which certain adequately identified activities furthered a conspiracy.

requests. For example, the Government suggested during oral argument that, hypothetically, it might possess information that a particular defendant traveled to a particular location at some point during 1997. (*See* Transcript of Proceedings, Feb. 29, 2000, at 77.) If it is the case that the defendant's passport reveals 3 trips made to that location, one each in March, June, and October of 1997, the Government contended, it would be impossible for it to specify the particular trip to which the Indictment refers. (*Id.*) We recognize that it would improperly limit the Government's proof if, under the circumstances posed in that hypothetical, it were forced to identify a specific trip in a bill of particulars. However, we do not believe that because the Government might be unable to provide a complete response to a Defendant's request for information, it should therefore not provide any information at all. If, in good faith, the Government determines that it cannot provide the particulars we have ordered, it may so indicate in its bill of particulars and provide as much detail as it can. Following the hypothetical posed in oral argument, therefore, we believe that it would be an acceptable response to this Court's order for the Government to indicate that it would offer proof at trial that "one or more of the three trips taken by that defendant during March, June, and October of 1997" was a trip made in furtherance of the charged conspiracies.

The Government also argues that it should not be required to respond to the Defendants' requests for particulars because it has included a list of 144 overt acts in the Indictment. However, the Government is plainly not limited in its proof of overt acts at trial to those that are set forth in the Indictment. *See United States v. Bryan*, 122 F.3d 90, 93 (2d Cir. 1997), *aff'd on another ground sub. nom., Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998); *United States v. Armone*, 363 F.2d 385, 400 (2d Cir.1966). The Defendants and their counsel cannot, therefore, limit their trial prep-

arations to the set of 144 overt acts set forth in the Indictment.

Moreover, even if the Government were to limit its proof to the 144 overt acts alleged in the Indictment, many of those allegations are charged in such general terms that the Defendants' trial preparation might nevertheless be unduly burdened, creating a risk of prejudicial surprise at trial. Although the Government need not have included so many overt act allegations in the Indictment, having chosen to do so, it cannot be permitted to allege overt acts in such general terms as to require seemingly unlimited research and investigation by the Defendants in an attempt to answer those charges. We note, specifically, the following allegations:

a. The overt act alleged in the Indictment at ¶ 12d, which charges that:

At various times from at least as early as 1989 until the date of the filing of this Indictment, the defendants USAMA BIN LADEN and MAMDOUH MAHMUD SALIM, and others known and unknown to the Grand Jury, engaged in financial and business transactions on behalf of al Qaeda, including but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of al Qaeda and its associated terrorist organizations in various countries throughout the world. To carry out some of these financial transactions, the defendant MAMDOUH MAHMUD SALIM traveled to various places on behalf of al Qaeda and its affiliated groups, including, among other places to Sudan, Afghanistan, Malaysia and the Philippines.

For a Defendant to respond to this allegation, it would be necessary to examine any activity in which Mr. Salim was engaged from 1989 until the date the Indictment was filed (June 16, 1999), which might be the basis for an accusation that

he "traveled" or engaged in a "financial" or "business transaction[ ] on behalf of al Qaeda." It seems to the Court that such an investigation would be unduly burdensome to the defense. Although the Indictment specifies some of the "financial and business transactions" involved and lists four places to which Salim is alleged to have traveled, the inclusion of those particulars does not limit the scope of defense counsel's inquiries because neither list purports to be exclusive.

By contrast, many of the other overt act allegations involving travel provide sufficient detail to permit defense counsel reasonably to focus their investigation. For example, the overt act alleged in the Indictment at ¶ 12xx reads, in full, as follows: "In or about December 1995, the defendant WADIH EL HAGE visited the defendant ALI MOHAMED in Santa Clara, California." Unlike the allegation in ¶ 12d, the one set forth in ¶ 12xx specifies the month during which the travel occurred, the destination, and the specific purpose for that travel. The Defendants could reasonably focus their preparations with respect to this allegation to a narrow class of conduct—travel by Mr. El Hage to a particular city in California in a particular month to visit a particular individual. We therefore deny Mr. El Hage's request for the Government to include in its bill a specification as to "the date(s) and exact location(s) at which Mr. El–Hage visited Ali Mohamed in Santa Clara, California." (Dratel Declaration at ¶ 7(ww).) For similar reasons, we deny the requests listed in the Dratel Declaration at ¶ 7(xx) (seeking particulars about a "December 1995" visit by El Hage to Al Fawwaz in London) and 7(bbb) (seeking particulars about a "late January 1997" trip by El Hage to Pakistan to visit "leaders of al Qaeda").

However, because the allegation contained in ¶ 12d contains no similar limitation, we order the Government to respond in its bill of particulars to the requests made by defense counsel with respect to that allegation. (See Goltzer Letter at ¶ 15 (asking the Government to "set forth the exact dates, times and places to and from which Mr. Salim allegedly traveled on behalf of al Qaeda, identify the affiliated groups on whose behalf he traveled, and specify the exact nature of the financial or business transaction and the identity of all participants").).

b. The overt act alleged in the Indictment at ¶ 12f, which charges that:

Following al Qaeda's move to the Sudan in or about 1991, the defendant USAMA BIN LADEN established a headquarters in the Riyadh section of Khartoum. USAMA BIN LADEN also established a series of businesses in the Sudan, including a holding company known as "Wadi al Aqiq," a construction business known as "Al Hijra," an agricultural company known as "al themar al Mubaraka," an investment company known as "Ladin International," an investment company known as "Taba Investments," a leather company known as the "Khartoum Tannery," and a transportation company known as "Qudarat Transport Company." These companies were operated to provide income to support al Qaeda and to provide cover for the procurement of explosives, weapons and chemicals and for the travel of al Qaeda operatives. The defendants MAMDOUH MAHMUD SALIM and WADIH EL HAGE worked for various of the Bin Laden companies. The defendant WADIH EL HAGE also served as Bin Laden's personal secretary;

the overt act alleged at ¶ 12r, which charges that:

In or about 1993, various members of al Qaeda, including the defendant KHALED AL FAWWAZ, began to establish businesses and residences in Kenya, particularly in Nairobi;

and the overt act alleged at ¶ 12u, which charges that:

In or about 1994, the defendant WADIH EL HAGE moved from Khartoum in the Sudan to Nairobi, Kenya and set up businesses and other organizations in Kenya. While in Kenya, the defendant WADIH EL HAGE met repeatedly with

one of the military commanders of al Qaeda, "Abu Ubaidah al Banshiri."

To respond to the allegation contained in ¶ 12f, a Defendant would need to investigate, and prepare to respond to, any evidence about Mr. El Hage's or Mr. Salim's associations with businesses in the Sudan since 1991 that might give rise to an accusation that the business was a "Bin Laden" company and that El Hage's or Salim's work furthered the interests of al Qaeda. As with the allegation in ¶ 12d, the inclusion of a list of businesses in ¶ 12f does not permit defense counsel to focus their inquiries since that list does not purport to be exclusive. Similarly, although the allegations contained in ¶¶ 12r and 12u are limited to entities established in 1993 and 1994, respectively, we believe that the terms "businesses and residences" [23] and "businesses and other organizations" are so general that it is necessary for the Government to limit the scope of those allegations by providing particulars.

There are many overt act allegations in the Indictment other than those contained in ¶¶ 12f, 12r, and 12u, as to which the Defendants have requested particulars, which do not specify precise dates or locations and allege generally that a certain type of activity occurred. For example, the very first overt act alleged—the provision of "training camps and guesthouses"

to al Qaeda members and affiliated groups—is alleged to have occurred "[a]t various times . . . in various areas." (*See* Indictment at ¶ 12a.) Nevertheless, we believe that the term "provided training camps and guesthouses" denotes a sufficiently precise type of conduct that the Defendants would be able sufficiently to focus their responsive preparations. We therefore deny the Defendants' requests with respect to that allegation. (*See* Dratel Declaration at ¶ 7(w).) Similarly, we have reviewed many of the other requests made by the Defendants that involve open-ended and under-defined overt act allegations and deny those requests on the ground that the type of conduct involved is sufficiently concrete and particular as to permit a reasonably focused investigation.[24]

However, because the three allegations identified above (those set forth in the Indictment at ¶¶ 12f, 12r, and 12u) involve such broadly-defined activities as setting up businesses, residences, and other organizations, we order the Government to include in the bill of particulars a response to the requests made by counsel for Mr. Salim (*see* Goltzer Letter at ¶ 16 (requesting that, with respect to ¶ 12f, the Government "identify the entire series of businesses, when they were established and identify the specific business or busi-

---

**23.** It is worth noting, as well, that although the allegation contained in ¶ 12r specifically mentions Al Fawwaz by name, it would not be limited to business and residences established by that particular Defendant, since the allegation also refers to such entities established by "various members of al Qaeda," including, presumably some of the other Defendants named in the Indictment.

**24.** *See* Dratel Declaration at ¶ 7(x)–(z), (ff)–(jj), (oo)–(ss), (vv), (zz)–(aaa), (ddd)–(eee), (ppp)–(ttt), (bbbb)–(eeee), and (hhhh); and Goltzer Letter at ¶¶ 13, 17–28 (seeking particulars with respect to allegations of the following overt acts: those contained in the Indictment at ¶¶ 12(b) (recruiting United States citizens), 12h (issuing fatwahs), 12p (receiving reports about means of attacking U.S. troops in Somalia), 12q (providing military training and assistance to Somali tribes), 12y (attacking U.S. military personnel in Soma-

lia), 12z (transporting weapons), 12aa (lecturing on Islamic law), 12bb (attempting to obtain nuclear weapons), 12cc (attempting to obtain chemical weapons), 12ff (applying for translation work at the FBI), 12tt (reporting to co-conspirators about Sheik Rahman's trial), 12aaa (providing al Qaeda members with communications equipment), 12iii (forwarding a Declaration of Jihad to England), 12mmm (transporting a particular amount of cash to Kenya), 12www (same), 12yyy (hiding files), 12eeeee (discussing formation of a united front of Islamic extremist groups), 12hhhhh (obtaining a false passport), 12nnnnn (meeting at a particular villa in Nairobi at a particular time), 12ppppp (meeting in a particular hotel in Nairobi on a particular date), 12rrrrr (reconnoitering the American Embassy in Nairobi on a particular date), and 12xxxxx (faxing a claim of responsibility for the East African bombings)).

ness[es][sic] for which Mr. Salim allegedly worked, the nature of the work he did, and the date or dates of the work for each company")) and by counsel · for Mr. El Hage (*see* Dratel Declaration at ¶ 7(bb) (requesting that the Government "identify any companies not named" in ¶ 12f)), 7(kk) (requesting that the Government "identify the 'various members of al Qaeda,' as well as the 'businesses and residences'" established in Kenya in 1993), and 7(ll) (requesting that "the Government identify the 'various businesses and other organizations' in Kenya 'set up' by Mr. El Hage" in 1994) with respect to the allegations contained in ¶¶ 12f, 12r, and 12u.[25]

c. The overt act alleged in the Indictment at ¶ 12uuu:

> At various times during the course of the conspiracy, the defendants ALI MOHAMED and WADIH EL HAGE engaged in coded correspondence with other members and associates of the al Qaeda organization.

It is in the nature of "coded correspondence" that the documents are not self-identifying. Unless the Defendants know the date or subject matter of the correspondence, or are provided with some other means of identification, it would be impossible for them to determine the documents to which the Indictment refers. We believe that, without some additional identifying information, the bare allegation that two defendants engaged in "coded correspondence" requires supplementation with a bill of particulars.

By contrast, many other allegations in the Indictment refer to coded correspondence, but specify the date of the correspondence. It is the Court's view that the

inclusion of a date permits the Defendants to make a reasonable estimate as to the document to which the Indictment refers. We therefore deny the requests made for particulars with respect to those allegations. (*See* Dratel Declaration at ¶¶ 7(fff), 7(ggg), 7(iii), 7(kkk), and 7(lll).) Some allegations involving coded correspondence include even more identifying detail. For example, the overt act alleged in the Indictment at ¶ 12xxx, which reads, in pertinent part, that:

> In or about the summer of 1997, the defendant WADIH EL HAGE possessed in his files at a location in Nairobi, Kenya various coded letters and documents, including documents referring to "Nawawi," ...

provides defense counsel with several specific details that might be used to focus their preparations. The request for the Government to identify the code in that allegation (*see* Dratel Declaration at ¶ 7(rrr)) is also denied.

However, because the allegation contained in the Indictment at ¶ 12uuu contains no identifying information whatsoever and merely refers generally to "coded correspondence," we believe that a bill of particulars is required. We therefore order the Government to provide some particulars to Mr. El Hage with respect to that allegation.

### 2. Requests for Identification of Unindicted Co–Conspirators

■ Whether the Government should be required to identify each unindicted co-conspirator presents a more difficult question.[26] In a recent opinion, Judge Scheind-

---

**25.** The Government is only directed to respond, however, to the particular request by El Hage contained in ¶ 7(bb) of the Dratel Declaration. El Hage has also requested that the Government identify how he worked as a personal secretary for Bin Laden. (*See* Dratel Declaration at ¶ 7(ee).) The Government is not directed to include a response to that request in its bill of particulars, because it is apparent to the Court that the requested information is provided in the Government's

response to Mr. El Hage's application for bail. (*See* Affirmation of Patrick J. Fitzgerald of December 30, 1999, at ¶ 9.)

**26.** "The Second Circuit has affirmed both the grant and the denial of ..." requests to identify unindicted co-conspirators. *Nachamie*, 2000 WL 37993, at *5 (citing *Torres*, 901 F.2d at 233–34 (affirming denial); *Feola*, 651 F.Supp. at 1131–34, *aff'd*, 875 F.2d 857 (2d Cir.1989) (affirming granting)).

lin articulated some of the factors a court must consider when examining this issue:

> If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met. If the government has failed to provide adequate notice of the particulars, or if the discovery has been voluminous, identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial. On the other hand, considering the potential danger to the co-conspirators and the risk of compromising continuing investigations allows a court to balance a defendant's need for the information against legitimate law enforcement concerns.

*Nachamie*, 2000 WL 37993, at *6 & n. 8 (citing *United States v. Turkish*, 458 F.Supp. 874, 881 (S.D.N.Y.1978); *In re United States*, 834 F.2d 283, 286 (2d Cir. 1987)). Each of those concerns is relevant in this case. Most fundamentally, we recognize that the investigation into at Qaeda is ongoing and that individuals associated with al Qaeda are accused of using the most severe types of violence in furtherance of their goals. We understand, therefore, that the Government has legitimate concerns that render it hesitant to reveal the names of unindicted co-conspirators.

On the other hand, as noted above, the conspiracies alleged here were quite long-running (nearly ten years, and allegedly ongoing) and involved a large number of co-conspirators (at least 20 individuals). Discovery has been, consequently, extremely voluminous. Moreover, an addi-tional concern exists in this case stemming from the fact that the Government claims (as is clear from the case's caption) that many of the alleged co-conspirators used several aliases and/or code names to conceal their identities. When examining documents that refer to individuals using code names and aliases, it can become quite difficult to determine to whom the Government claims a particular name refers. We are sympathetic, therefore, with the magnitude of defense counsel's burden in trying to decipher the identities of alleged co-conspirators. A bill of particulars revealing the names of all persons whom the Government will claim at trial were unindicted co-conspirators might, therefore, be necessary to prevent prejudicial surprise at trial.[27]

We conclude that the Government must disclose to the Defendants the identities, including all aliases and code names, of all unindicted co-conspirators to whom it will refer at trial, unless it makes a particularized determination, in good faith, with respect to each co-conspirator whose identity is withheld, that disclosure of that person's identity will either (1) expose the person or someone else to a significant risk of bodily harm; or (2) compromise an ongoing investigation.[28] We note that the Government has already revealed the identity of at least two unindicted co-conspirators. (*See* Indictment at ¶ 12vvvv (identifying a co-conspirator by the name "Azzam"), 12dddddd (identifying a co-conspirator by the name "Ahmed the German").) The obligation we impose here is continuing. If, after filing its original bill of particulars, the Government determines that withholding the identity of a co-conspirator

**27.** *Cf. United States v. Taylor*, 707 F.Supp. 696, 700 (S.D.N.Y.1989) (requiring the government to provide the names of "all persons whom the government will claim at trial were co-conspirators" in a bill of particulars) (citing *Feola*, 651 F.Supp. at 1132–34); *United States v. Strawberry*, 892 F.Supp. at 527 (ordering the filing of a bill of particulars disclosing the names of co-conspirators and the dates that the defendants and co-conspirators joined and left the conspiracy); *United States v. Allocco*, 801 F.Supp. 1000, 1003 (E.D.N.Y. 1992); *United States v. Chovanec*, 467 F.Supp. 41, 45 (S.D.N.Y.1979).

**28.** If a good faith response to any of the requests which the Court has granted will entail a security risk which is not apparent to the Court based on the present state of the record, the Government may make an *in camera* submission to the Court setting forth the reasons why this is so.

whose identity it initially failed to disclose no longer meets the conditions specified above, it is to provide that identity to defense counsel. *See* Fed.R.Crim.P. 7(f) (providing that "[a] bill of particulars may be amended at any time subject to such conditions as justice requires.") Therefore, in accordance with the foregoing conditions, we order the Government to respond, in the bill of particulars we order today, to the following requests insofar as those requests seek the identities of co-conspirators: (1) those contained in the Dratel Declaration at ¶¶ 7(x), 7(aa), 7(kk), 7(ccc), 7(fff)–7(nnn), and 7(zzz)–(aaaa); (2) those contained in the Goltzer Letter at ¶¶ 2, 29; and (3) those contained in K.K. Mohamed's Memorandum of Law at 6, ¶ 2.

3. Requests for Details as to the Formation of the Alleged Conspiracies, each Defendant's Joining of the Conspiracies, and the Defendants' Roles in the Conspiracies

■ With respect to each of the conspiracies charged in the Indictment, El Hage and K.K. Mohamed seek particulars as to the (1) date (and in El Hage's case, the location) that they joined the conspiracies [29] and (2) the role they played in the various offenses.[30] El Hage also seeks particulars with respect to (1) "when, where, how, and with whom" he agreed to each of the criminal objectives set forth;[31] and (2) "to the extent not otherwise named in the Indictment," the degree to which those criminal objectives were achieved.[32]

In considering each of those requests, we are persuaded by the reasoning articu-lated by Judge Weinfeld in *United States v. Wilson,* 565 F.Supp. 1416 (S.D.N.Y. 1983), who, in the course of addressing similar requests, noted that:

The existence of a conspiracy and a defendant's participation therein is usually established by circumstantial evidence based upon independent proof of each alleged co-conspirator's acts, conduct and statements and the totality of conduct of all the participants and the reasonable inferences to be drawn therefrom.

*Id.* at 1439 (quoting *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962)) (internal quotation marks omitted). "[T]he government is not required to prove," therefore, "exactly when or how a conspiracy was formed or when a particular defendant joined the scheme...." *United States v. Matos–Peralta,* 691 F.Supp. 780, 791 (S.D.N.Y.1988) (citing *United States v. Politi,* 334 F.Supp. 1318 (S.D.N.Y.), *aff'd,* 516 F.2d 897 (2d Cir. 1975)). To require specification of particulars with respect to the formation of the conspiracy when such details need not be proved at trial would, in our view, "unduly restrict the Government's proof." *Wilson,* 565 F.Supp. at 1439 (citation omitted). For that reason, requests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have "almost uniformly been denied." *Id.* at 1438 (quoting *Kahaner,* 203 F.Supp. at 84, and citing *United States v. Lieberman,* 15 F.R.D. 278 (S.D.N.Y.1953)).[33]

---

29. *See* Dratel Declaration at ¶¶ 7(k), 7(oooo), 7(ssss), 7(vvvv), 7(aaaaa), 7(fffff); K.K. Mohamed's Memorandum of Law at 6, ¶ 3.

30. *See* Dratel Declaration at ¶¶ 7(v); K.K. Mohamed's Memorandum of Law at 6, ¶¶ 1, 4–5.

31. *See* Dratel Declaration at ¶¶ 7(m)–(*o*), 7(r), 7(t), 7(pppp), 7(tttt)–(uuuu), 7(wwww)–(xxxx), 7(bbbbb)–(ccccc), 7(ggggg)–7(hhhhh), 7(iiiii)–(jjjjj).

32. *See id.* at ¶¶ 7(p)–(q), 7(s), 7(u), 7(qqqq)–(rrrr), 7(yyyy)–(zzzz), 7(ddddd)–(eeeee), 7(iii-ii).

33. *See also Nachamie,* 2000 WL 37993, at *7 (citations omitted); *Mittal,* 1999 WL 461293, at *9 (citing *Matos–Peralta,* 691 F.Supp. at 791; *United States v. Pacheco,* 902 F.Supp. 469, 474–75 (S.D.N.Y.1995); *United States v. Thomas,* 94 Cr. 835, 1995 WL 312481, at *1 (S.D.N.Y. May 22, 1995)); *United States v. Reinhold,* 994 F.Supp. 194, 201 (S.D.N.Y. 1998); *Muyet,* 945 F.Supp. at 599 (S.D.N.Y. 1996); *United States v. Jimenez,* 824 F.Supp. 351, 363 (S.D.N.Y.1993).

Moreover, we believe that, in this case in particular, the unusual scope and breadth of the conspiracies alleged weighs against granting the requested particulars. As noted above, it is not the Government's burden at trial to establish a precise chronology as to when each defendant, as well as other unindicted co-conspirators, joined the conspiracies. Nor need the Government present evidence at trial as to the way in which a Defendant's acts furthered the conspiracies' overall objectives. To require it to do so in a bill of particulars when the conspiracy in question spread around the globe and included a large number of people performing widely disparate tasks would, in our view, be unduly burdensome. Moreover, it is not necessary to the Defendants' preparation to have such information. The Defendants' requests for particulars as to the formation of the alleged conspiracies, the date, location, circumstances under which each defendant allegedly joined, and as to each Defendant's role(s) in the charged conspiracies, *see supra* nn. 29–32, are therefore denied.

C. Requests Pertaining to Non–Conspiracy Charges

1. Requests Involving the "Background" Section of the Indictment

Both El Hage and Salim include in their requests for particulars numerous requests pertaining to the "Background" section of the Indictment. (*See* Dratel Declaration at ¶¶ 7(a)–(j); Goltzer Letter at ¶¶ 3–11.) Introductory material such as that contained in the "Background" section of the Indictment is "undoubtedly helpful" to a jury in its effort to understand "the full scope of the defendant's activities, and to place the defendant's conduct in the appropriate context." *United States v. Watt,* 911 F.Supp. 538, 554 (D.D.C.1995); *see also United States v. Langella,* 776 F.2d 1078, 1081 (2d Cir.1985) (refusing to strike background paragraphs on ground that they provided relevant information about the crimes charged). However, the "Background" section does not constitute a criminal charge which the Defendant must

answer. We do not believe, therefore, that further detail as to the matters contained in the Background section are necessary to the Defendants' preparations and we, therefore, do not order that the Government's bill of particulars be responsive to those requests. (See Dratel Declaration at ¶¶ 7(a)–(j); Goltzer Letter at ¶¶ 3–11.)

2. Requests Involving Perjury and False Statements

Both El Hage and Salim have requested that the Government provide particulars with respect to claims that they made false statements. It appears, however, that the Government has already responded to those requests by identifying the statements that it claims are false. (*See* El Hage's Reply Memorandum at 9 (indicating that the Government has responded to its requests for particulars with respect to the Indictment's allegations of false statements); Letter from Garcia to McAllister of Jan. 19, 2000 (identifying the statements made by Salim that the Government believes to be false)). Because the Government has already responded to these requests for particulars, we do not order it to include those responses in the bill of particulars that it is to file.

3. Miscellaneous Requests

a. Odeh's Request

Defendant Odeh has submitted only a single request for information to be included in a bill of particulars. He seeks specification as to "what it is that [the Government will] claim that Mr. Odeh actually did to further the bombing in either Kenya or Tanzania." (Letter from Young to Fitzgerald of November 3, 1999, attached as Exhibit A to Odeh's Notice of Motion, at ¶ MSO76.) Our review of the Indictment, however, discloses several specific acts which Mr. Odeh is alleged to have committed. The Government is not required, in a bill of particulars, to articulate how each defendant's activity furthered the bombings. Whether acts furthered the bombings is an inference to be drawn by the

jury based on the Government's proof of the Defendant's conduct. The bill of particulars need not respond to that request.

### b. Witness List

Defendant Salim requests that the Government provide a list of witnesses who will testify at trial. Such information clearly extends beyond what is required for the Defendants to be able to prepare a defense. That request is therefore denied.

### CONCLUSION

Subject to the conditions and limitations set forth above, the Government is hereby directed to file a bill of particulars. The bill is to be responsive to those specific requests for information that the Court has identified above. To the extent that the Defendants' motions seek the inclusion of additional information in a bill of particulars, those motions are denied.

SO ORDERED.